Anthony HALL, Petitioner–Appellant,

v.

Odie WASHINGTON, Director,
Respondent–Appellee.

No. 96–1704.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 21, 1996.

Decided Feb. 4, 1997.

Rehearing and Suggestion for Rehearing
En Banc Denied March 10, 1997.

Richard E. Cunningham (argued), Anne E. Carlson, Chicago, IL, for Petitioner–Appellant.

Arleen C. Anderson, Bradley P. Halloran, Office of the Attorney General, Penelope Moutoussamy George (argued), Office of the Attorney General, Criminal Appeals Division, Chicago, IL, for Respondent–Appellee.

Before CUMMINGS, ROVNER, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

On February 8, 1983, Anthony Hall, then an inmate at Pontiac Correctional Center, fatally stabbed Frieda King and stuffed her body in a closet next to a large walk-in freezer in the prison kitchen. King had been the civilian supervisor of the kitchen at Pontiac. After a brief investigation, Hall was charged with the murder and went to trial before Judge William T. Caisley of the Circuit Court for Livingston County, Illinois. After a trial to the court, Judge Caisley found Hall guilty of murder and, following a sentencing hearing held six weeks later for which Hall also purportedly waived his right to a jury, he sentenced Hall to death. Hall appealed his conviction and sentence to the Illinois Supreme Court, which affirmed. *People v. Hall,* 114 Ill.2d 376, 102 Ill.Dec. 322, 499 N.E.2d 1335 (1986) (*"Hall I"*). He then filed a post-conviction petition pursuant to Illinois law, 725 ILCS 5/122–1 *et seq.* (1994), which Judge Caisley denied following an evidentiary hearing. That denial was also affirmed by the Illinois Supreme Court. *People v. Hall,* 157 Ill.2d 324, 193 Ill.Dec. 98, 626 N.E.2d 131 (1994) (*"Hall II"*).

Once his state remedies were exhausted, Hall filed a petition for a writ of habeas corpus in the district court pursuant to 28 U.S.C. § 2254. He presented a total of seven alleged constitutional violations (one of which had ten sub-parts), some of which allegedly invalidated his conviction and his sentence, and some just the sentence. The district court denied his petition and he now appeals to this Court, attacking the entire proceeding on two grounds and his sentence on three additional grounds. Although we find no reversible error in the district court's judgment denying habeas relief on the case as a whole, we conclude that Hall received ineffective assistance of counsel at sentencing. He is therefore entitled to a writ of habeas corpus limited to his sentence.

## I

The pre-trial and trial proceedings in Hall's case were unusually contentious. Hall initially informed the court he would obtain private counsel, but when he was unsuccessful, the court, on March 8, 1983, appointed David Ahlemeyer, the Public Defender of Livingston County, to represent him. The relationship between Ahlemeyer and Hall was poor from the outset. After his appointment, Ahlemeyer did not visit Hall to discuss his case for over three months, during which time Hall fruitlessly attempted to reach Ahlemeyer by phone and through letters. Although the State had begun to provide Ahlemeyer with discovery materials, Ahlemeyer did nothing to share this information with Hall. Unhappy with his attorney's services, Hall began again to search for another lawyer. He sent several requests to the court for new counsel, in which he described Ahlemeyer's lack of attention to the case, but the court decided that it would appoint another attorney only if Hall could show that Ahlemeyer had a conflict of interest. On

June 29, 1983, Ahlemeyer tried (apparently for the first time) to meet with Hall to discuss the case, but Hall refused to see him. This prompted Ahlemeyer to move on July 11, 1983, to withdraw from the case. Consistently with its earlier ruling, the court again denied the motion because Ahlemeyer did not allege a conflict of interest.

Matters went from bad to worse between Hall and Ahlemeyer following the July motion. In late September, Ahlemeyer sought a second meeting with Hall, which Hall again refused to grant. At a fitness hearing held on October 4, 1983, Ahlemeyer informed the court that Hall was being uncooperative. Hall replied threateningly that his refusal to cooperate was a rational act and implied that if Ahlemeyer ever came "within an arm's length" of him, he would assault the lawyer. The court found Hall was fit for trial and denied a second motion to withdraw presented by Ahlemeyer. At that time, however, the court offered to appoint Steven Skelton, the Public Defender of McLean County, as additional counsel. Hall initially refused the offer, but later (after an unsuccessful effort to convince the court to appoint a private attorney he had found) he acquiesced and the court appointed Skelton. In the course of three more court appearances between December 5, 1983, when Skelton was appointed, and February 21, 1984, when the trial began, nothing in the record indicates that Hall was being uncooperative.

Hall's behavior problems were not, however, at an end. Following jury selection, Hall informed the court that he wished to proceed *pro se* because his attorneys refused to call two particular witnesses on his behalf. Hall, Ahlemeyer, Skelton, and the judge adjourned to chambers to discuss the matter outside the presence of the jury. Judge Caisley warned Hall of the dangers of proceeding unrepresented in a capital case, while Ahlemeyer and Skelton objected to Hall's proposal that he proceed *pro se* with backup help from the lawyers. Judge Caisley then began to ask Hall about the witnesses, and in his own words, the following events took place:

> ... let the record further show that defense counsel, Steven Skelton, has just been struck on the head by the defendant

with a chair and that the court has also been struck by the defendant on the head with his fist.....

*Hall I*, 102 Ill.Dec. at 326, 499 N.E.2d at 1339. Hall had also hurled a chair at Ahlemeyer before he was restrained. When court reconvened, the court denied Hall's request to represent himself and ordered that Hall be shackled for the duration of the trial. Skelton and Ahlemeyer moved to withdraw, arguing that the attorney-client relationship was now irretrievably lost, and asked the judge to recuse himself. The court denied both requests, the jury returned to the courtroom, and the trial proceeded with Hall seated away from his attorneys, shackled and with several guards standing behind him.

During the prosecution's opening statement, Hall personally interrupted the proceedings to tell the court that he wanted to waive his right to a jury. The judge replied that he would consider the waiver request after opening statements. Following completion of the State's opening statement, the judge explained the seriousness of the charges and the range of penalties Hall faced. He told Hall that if Hall waived a jury, the judge would determine both the facts and the law in the case. When Hall realized that the court intended to accept his waiver only for the guilt/innocence stage of the proceedings, he attempted to waive a jury in advance for any possible sentencing proceedings that might follow. After a somewhat lengthy exchange with Hall, his lawyers, and the prosecutor, the court decided to accept Hall's waiver only for the guilt/innocence stage of the trial and to reserve decision on the request to waive the jury for sentencing. At no time during this exchange did anyone discuss the operation of capital sentencing juries under Illinois law.

On March 2, 1984, the court announced its finding that Hall was guilty of the murder. The State promptly reiterated its intention to seek the death penalty and requested that Hall decide whether to have a jury make the capital sentencing determination. Noting that this was a decision Hall might wish to discuss with counsel, the court recessed for an hour. When court reconvened, the judge opened by reciting the sections of the Illinois

Criminal Code that would govern the sentencing phase and by noting that Hall had a right to a jury determination of his penalty. The judge then asked Hall directly whether he had "had an opportunity to discuss with [his] counsel whether or not [he] desired to have a jury determination of whether capital punishment or some other lawful sentence is to be imposed." Hall replied "no," which prompted the court to order another short recess at which he could discuss the issue with counsel. Hall and his lawyers talked for a mere 40 seconds, during which time they told Hall simply that he had a right to a jury at sentencing. Neither of his defense attorneys advised Hall that under Illinois law, while it takes a unanimous jury to impose death, it takes the vote of only one juror to ensure that a defendant will be spared that penalty. 720 ILCS 5/9–1(g); *Emerson v. Gramley,* 91 F.3d 898, 907 (7th Cir.1996). Nor did they request more time to consult with Hall. After the 40–second consultation between Hall and his counsel, the court accepted Hall's sentencing jury waiver.

At Ahlemeyer's request, the court chose the later of two available dates for the capital sentencing hearing, scheduling it for April 17, 1984. Just as the sentencing hearing was about to begin on that date, Hall informed the court that he wanted to withdraw his waiver of a jury. He explained that he had just learned (from a different lawyer, Mr. Charles Schiedel, Deputy Defender of the Supreme Court Unit of the State Appellate Defender's Office) that Illinois law requires a jury unanimously to agree on the death penalty before it can be imposed. In other words, he had not realized at the time of his waiver that a single hold-out juror would mean the difference between execution and life in prison. The court refused to allow him to change his mind, apparently because the first jury (which had been selected but not used for the February trial) had been discharged on March 2, even though the court had never decided whether that jury would have been used for sentencing.

Six weeks elapsed between the conviction and the sentencing hearing—six weeks in which Hall's lawyers did practically nothing to advance his case. They did not contact him even a single time to discuss the upcoming sentencing hearing or to inquire about possible mitigating evidence or witnesses who might be available to testify on his behalf. They did not return telephone calls or write back to individuals who were volunteering to offer mitigating testimony. Due to their neglect, they never learned about a number of readily available mitigation witnesses. They never explained to Hall the importance of the sentencing phase of a capital case, the unique role of the sentencing jury, or that a probation officer would visit him to conduct a pre-sentence investigation with whom he should cooperate. Because he had not been told what the probation officer's role was, Hall refused to speak with her when she came to the prison to meet with him. Even after that incident, about which Ahlemeyer knew, Ahlemeyer did not attempt to contact Hall to advise him to be more cooperative with her.

During the state post-conviction hearing, it became apparent that counsels' utter disregard of the case caused them to overlook a substantial amount of mitigating evidence, both in quantity and in quality. The later hearing revealed the existence of ten people who would have testified for him at his sentencing hearing but who had not been contacted or not been asked to testify by either Skelton or Ahlemeyer. For example, Thomas O'Connor had been an employee of the Illinois Department of Corrections and had met Hall while working at Pontiac. O'Connor was willing to testify that Hall had been very helpful to O'Connor and other Food Service employees and that Hall was loyal, cooperative, and reliable. Counsel clearly knew of O'Connor's availability, because he had testified as a defense witness at trial; a simple telephone call would have revealed whether O'Connor was willing to testify on Hall's behalf for purposes of sentencing. At the post-conviction hearing, he stated that he would have testified at the sentencing hearing but was never asked to do so by either of Hall's attorneys. Another overlooked witness, Patricia Rolfe Hunt, would have testified that Hall (who babysat for her occasionally) had literally saved the life of one of her children when the child began choking on some food.

Two other witnesses were also available who would have testified that Hall risked his own life to save theirs. Leta Powell had met Hall 15 years earlier when he jumped into the deep end of a pool to rescue her from drowning. It appears Hall gave her name to defense counsel, but they did not contact her. Moreover, Powell testified at the post-conviction hearing that she called both Skelton and Ahlemeyer to offer to testify at Hall's sentencing hearing but that neither attorney ever returned her calls. Another woman whose testimony might have provided assistance to Hall was Paula Robinson. She would have testified that she had been accosted outside her home by a man wielding a knife and demanding money and that Hall had interrupted the robbery and chased the man away. Because neither Ahlemeyer nor Skelton ever spoke with Hall during the six weeks between his conviction and the capital sentencing hearing, they did not learn of Robinson's availability nor of the availability of other possible mitigation witnesses. Nor did they do any independent investigation on their own that might have led them to these or other witnesses. Thus, none of these witnesses testified at Hall's sentencing hearing.

Instead, at Hall's sentencing hearing the court heard only the testimony of two witnesses to counter the aggravating evidence presented by the State: Lloyd Shaddle, a part-time minister for the Jehovah's Witnesses who testified that Hall had attended religious services for a year prior to King's murder, and Hall himself. Although a third witness testified—Dr. Syed Ali, a psychiatrist at Pontiac Correctional Center—even the State does not contend that Dr. Ali provided mitigating testimony. In his closing argument to the court, Ahlemeyer made no effort to focus on even the meager mitigation evidence that the court had heard. Instead, he invited the judge to disregard the law of Illinois entirely, or, as he put it, "to focus in on an argument based [ ] just generally on the theory opposing the death penalty in all cases." For example, he began by saying "[t]he question now remains for you to decide today is [sic] whether you or God determines when and how [Hall] dies. That, Your Honor, is the problem with the death penalty.

The death penalty makes some human beings, whether it be a member of a jury or a judge, as in this case, play God." The remainder of the argument was the same, drifting at times into subjects like the Karen Ann Quinlan case (dealing with the right to terminate life sustaining measures), chemical warfare, abortion, the arbitrariness of the death penalty as administered in the United States, the incompatibility of the death penalty with "every Canon of Judeo Christian Ethics," the inappropriateness of vengeance, Pope John Paul II's act of forgiving the man who attempted to assassinate him, and the finality of the sanction. The entirety of his remarks relating to Hall in particular were as follows:

> The mitigating factors present in this case involve Mr. Hall's childhood development, lack of normal guidance and advantages that many of us have, his present abilities, his religious beliefs.

He then immediately said, "Your Honor, I am not asking you to spare Mr. Hall's life today solely for Mr. Hall's benefit. I am asking you to spare Mr. Hall's life today for all of our benefits, to demonstrate that we are not on the level of the perpetrators of vicious crimes...." He concluded by saying, "I do not mean for one moment to excuse what the killer did to Frieda King. I mean rather to point out that it is important for us to retain our human qualities even though there are those among us who fall below that level."

The prosecutor, in contrast, focused on Hall himself throughout his argument. He rightly reminded the judge that the State of Illinois includes the death penalty in its statutes and considers it appropriate in some cases. He reviewed the statutory mitigating factors outlined in § 9–1(c) of the state's death penalty statute and argued that Hall had not proven the existence of any of them. At the conclusion of the arguments, the judge began by making specific findings about the statutory aggravating and mitigating factors. He commented that "[t]he court finds that the mitigating factors here are very hard to find." With respect to nonstatutory mitigating factors, he discounted Dr. Shaddle's testimony on the ground that Hall's participation in Shaddle's Bible class

occurred before he killed King, and he concluded that this sequence indicated the unlikelihood of Hall's future rehabilitation. Faced with "all the aggravating factors ... stacked against the Defendant," and "a complete absence of mitigating factors," the court pronounced a sentence of death.

As noted above, the Illinois Supreme Court affirmed both the conviction and the capital sentence on direct appeal. Hall's petition for post-conviction relief went as a matter of course before Judge Caisley, the trial judge. In his order denying relief, Judge Caisley again reviewed the mitigating evidence that had been presented at the sentencing hearing. This time, he discussed in slightly more detail Hall's own account of his life, but the description fit the court's earlier assessment that there was "a complete absence of mitigating factors":

> The defendant offered testimony in mitigation of his offense. He testified that he was born when his mother was only 13 years old. He lived with his mother and his maternal grandparents until he was age 16, when he was first incarcerated. He had been out of prison only two years since his initial incarceration at age 16. He was 24 years old on February 8, 1983 and was 25 years old at the time of the sentence hearing. While in prison, he completed the necessary work to obtain his high school diploma by taking classes at Menard Correctional Center and he became a member of the Jehovah's Witnesses faith. After the defendant was transferred to the Pontiac Correctional Center, he was married. Lloyd Shaddle, a Jehovah's Witnesses minister who conducted religious services at the Pontiac Correctional Center testified that Hall attended services and regularly attended bible study classes and that he often expressed concern for his family.

The court noted that none of Hall's new evidence would have tended to prove the existence of any of the statutory mitigating factors of § 9–1(c). 720 ILCS 5/9–1(c). The rest of his additional evidence went only to Hall's character and personality, subjects about which the court asserted it was fully informed. It therefore concluded that there was no reasonable probability that the newly proffered evidence would have changed the outcome of the case. As noted earlier, the Illinois Supreme Court affirmed. See *Hall II.*

## II

This Court has decided that the new provisions of 28 U.S.C. § 2254, which were added by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), apply to Hall's case, which was pending on the effective date of the Act. See *Lindh v. Murphy,* 96 F.3d 856 (7th Cir.1996), *cert. granted,* — U.S. —, 117 S.Ct. 726, 136 L.Ed.2d 643, January 10, 1997 (No. 96–6298). See also *Hunter v. United States,* 101 F.3d 1565 (11th Cir.1996) *(en banc),* and *Drinkard v. Johnson,* 97 F.3d 751 (5th Cir.1996) (both of which agree with Lindh that the AEDPA applies to pending cases). But see *Boria v. Keane,* 90 F.3d 36, 38 (2d Cir.1996); *Edens v. Hannigan,* 87 F.3d 1109, 1112 n. 1 (10th Cir.1996); *Jeffries v. Wood,* 103 F.3d 827 (9th Cir.1996) *(en banc).* As amended by the AEDPA, § 2254 authorizes the issuance of a writ of habeas corpus only if the challenged decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Under these new standards, our review of state courts' legal determinations continues to be *de novo.* So, too, does our review of mixed questions of law and fact, see *Thompson v. Keohane,* — U.S. —, — – —, 116 S.Ct. 457, 464–65, 133 L.Ed.2d 383 (1995); cf. *Ornelas v. United States,* — U.S. —, — – —, 116 S.Ct. 1657, 1661–62, 134 L.Ed.2d 911 (1996) (requiring *de novo* review of determinations of reasonable suspicion and probable cause for search warrants in federal cases). Under the AEDPA, however, we must answer the more subtle question of whether the state court "unreasonably" applied clearly established federal law as the Supreme Court has determined it. *Pitsonbarger v. Gramley,* 103 F.3d 1293, 1297–98 (7th Cir.1996). The stat-

utory "unreasonableness" standard allows the state court's conclusion to stand if it is one of several equally plausible outcomes. On the other hand, Congress would not have used the word "unreasonable" if it really meant that federal courts were to defer in all cases to the state court's decision. Some decisions will be at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary, that a writ must issue. Applying this standard, we hold that the state court's finding that Hall's counsel provided effective assistance at sentencing "involved an unreasonable application of clearly established Federal law" as determined by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because the AEDPA imposes a higher burden on habeas petitioners than the prior law, it is clear that Hall would also have been entitled to relief even if it turns out that the AEDPA does not apply to pending cases. Thus, we need not await the Supreme Court's decision in Lindh in order to decide this aspect of the case.

### III

■ Resolution of a claim of ineffective assistance of counsel at the penalty phase of a capital trial, like other claims of ineffective assistance, involves two elements: performance and prejudice. To prevail on the claim, petitioner must demonstrate both that counsel's representation fell below an objective standard of reasonableness and that a reasonable probability exists that, but for counsel's substandard performance, the sentencer "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068–69; *Brewer v. Aiken,* 935 F.2d 850, 855 (7th Cir.1991).

■ The performance standard envisions a wide range of permissible actions for the attorney in question, and it normally requires us to defer to an attorney's choice of strategy. See *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065; *Emerson,* 91 F.3d at 906. Nevertheless, where counsel's errors are such that she "was not functioning as the 'counsel' guaranteed the defendant by the

Sixth Amendment," *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, her performance is deficient for these purposes. In the context of a capital sentencing hearing, it is particularly important that counsel not be allowed to shirk her responsibility. Thus, while we defer to legitimate, strategic decision-making, "[f]rom the perspective of strategic competence, we hold that defense counsel must make a significant effort, based on reasonable investigation and logical argument, to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors." *Kubat v. Thieret,* 867 F.2d 351, 369 (7th Cir.1989). Here, Hall's attorneys engaged in neither reasonable investigation nor logical argument. As in *Kubat,* Hall's representation at sentencing "amounted to no representation at all." *Id.* at 368.

Two distinct points are key to our conclusion: first, counsels' total failure to contact Hall in preparation for the sentencing hearing and their consequent failure to present his mitigation witnesses, and second, counsel's failure in his closing argument to offer any reason other than blatant disregard of Illinois law for sparing Hall's life. We take these in turn.

■ An attorney's decision not to present particular witnesses at the mitigation stage of a capital sentencing hearing does not necessarily brand his performance deficient. Such a decision can be strategically sound if it is based on the attorney's determination that the testimony the witnesses would give might on balance harm rather than help the defendant. *Emerson,* 91 F.3d at 906 (citing *Darden v. Wainwright,* 477 U.S. 168, 186, 106 S.Ct. 2464, 2474, 91 L.Ed.2d 144 (1986)). Such a determination can rationally be made, however, only after some inquiry or investigation by defense counsel. *Id.* This does not mean that only a scorch-the-earth strategy will suffice, compare *Stewart v. Gramley,* 74 F.3d 132, 135 (7th Cir.1996), but it does mean that the attorney must look into readily available sources of evidence. Where it is apparent from evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental

or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance. *Stewart*, 74 F.3d at 135. Similarly, where it appears from trial testimony that a witness might be willing to speak on behalf of one's client, or a defendant provides the names of possible mitigation witnesses, or individuals call to volunteer their testimony, counsel must at least take the time to contact those witnesses and determine for himself whether their testimony would be helpful. In the case before us, neither Ahlemeyer nor Skelton took even these simple steps, notwithstanding the impending capital sentencing hearing.

■ Ahlemeyer then compounded the problem with his closing argument. The death penalty may not constitutionally be applied without "consideration of the character and record of the individual offender and the circumstances of the particular offense." *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976); *Eddings v. Oklahoma*, 455 U.S. 104, 110–12, 102 S.Ct. 869, 874–76, 71 L.Ed.2d 1 (1982). The Illinois death penalty statute properly requires the sentencer to consider all mitigating factors relevant to imposition of the death penalty. 720 ILCS 5/9–1(c). In order for the sentencer to do so, however, counsel must present an argument that focuses the sentencer's attention on those mitigating factors. *Kubat*, 867 F.2d at 369.

■ As with other strategic decisions, defense attorneys have some latitude in choosing how to approach a closing argument at a capital sentencing hearing. A simple plea for mercy may be a valid choice, *if* that plea focuses on the particular defendant and the circumstances of the particular offense. See *Eddmonds v. Peters*, 93 F.3d 1307, 1322 (7th Cir.1996). Ahlemeyer's argument, as the description above shows, contained no such individualized appeal. Rather than asking the judge to decide against the death penalty for legally sufficient reasons—such as particular mitigating factors or the need for mercy in Hall's particular case—Ahlemeyer relied upon sweeping and largely irrelevant appeals to the judge's personal beliefs and religious principles. His only mention of Hall's particular history and character was pure boiler-

plate that could have been said of the majority of capital defendants. Nor did Ahlemeyer ever invite the court to find, as a matter of law, that the Illinois death penalty statute could not constitutionally be applied to Hall's case. (It would have been difficult to prevail on such an argument, even in 1984, *see, e.g., People v. Jones*, 94 Ill.2d 275, 68 Ill.Dec. 903, 447 N.E.2d 161 (1982), *People v. Davis*, 95 Ill.2d 1, 69 Ill.Dec. 136, 447 N.E.2d 353 (1983), and cases cited in *People v. Silagy*, 101 Ill.2d 147, 77 Ill.Dec. 792, 461 N.E.2d 415 (1984), but this would at least have been a recognizable legal position.) Ahlemeyer instead argued against using the death penalty because "vengeance is not ours to assert." In essence, Ahlemeyer was arguing for the judicial equivalent of jury nullification, asking the judge to ignore the valid law of Illinois and to decide against death on a wholly extralegal basis. Judge Caisley, told that he had a choice between disregarding his solemn oath to uphold the laws of Illinois and imposing the death penalty, quite understandably chose the latter course.

It was irresponsible and unacceptable for counsel, especially in the face of the numerous decisions of the Illinois Supreme Court upholding the Illinois death penalty statute (with which he never took issue), exclusively to adopt this line of argument. See also *Del Vecchio v. Illinois Department of Corrections*, 31 F.3d 1363 (7th Cir.1994) (en banc). Claims that the Bible or a particular religion opposes the death penalty "ha[ve] no bearing on the question whether a particular defendant who has been found guilty of capital murder should receive death or some lesser authorized penalty." *Stokes v. Armontrout*, 851 F.2d 1085, 1096 (8th Cir.1988). See also *Lewis v. Lane*, 656 F.Supp. 181, 193–94 (C.D.Ill.1987), *aff'd. on other grounds*, 832 F.2d 1446 (7th Cir.1987) (ineffective assistance found where closing argument, instead of individualizing defendant, focused on abstract religious and philosophic appeal). Given its total lack of focus on Hall's individual character and record and its reliance on irrelevant religious claims, Ahlemeyer's argument to the court cannot be considered a reasonable strategic choice under *Strickland.*

Recognizing how poor counsels' performance was, there is a hint in this record of the argument that Hall waived the right to effective assistance of counsel through his own misconduct, although the State never raises this point in its brief. A defendant's own conduct may serve to waive his right to appointed counsel. *United States v. Harris,* 2 F.3d 1452, 1455 (7th Cir.1993). In *Harris,* the court found waiver where a defendant remained uncooperative, after he had refused to cooperate with three different attorneys and had been warned that he would be required to proceed *pro se* if he did not cooperate with the fourth. See also *United States v. Fazzini,* 871 F.2d 635, 642 (7th Cir.1989). A defendant whose misconduct results in the loss of counsel may be required to represent himself, usually with an appointee as "shadow counsel." See *Harris,* 2 F.3d at 1455. Waiver of effective assistance of counsel in situations where counsel has not been excused may even be possible if the defendant's refusal to cooperate caused counsel's deficient performance. See *Kleba v. McGinnis,* 796 F.2d 947, 957 (7th Cir.1986) (counsel's failure to determine witness's whereabouts excused where defendant failed to make counsel aware of the potential witness). But see *Emerson,* 91 F.3d at 906–07 (failure to present mitigating witnesses at sentencing phase of Illinois death penalty case was ineffective assistance of counsel even where defendant told counsel not to present any evidence and declined to make any statement himself).

Here, neither the record nor the state judge's own findings support a finding of waiver. The record is devoid of any evidence that Hall continued to be violent or uncooperative once the trial was underway, much less that his earlier misbehavior continued at the sentencing phase. The trial court noted for the record at the close of the guilt/innocence phase that Hall had "pass[ed] notes, as well as making oral suggestions" to his attorneys during the defense of his case. In his post-conviction order, the court commented on how pleasant Hall could be at times. Most importantly, the trial judge, when presented with a motion by counsel to withdraw after Hall's assault, made a considered decision that they could represent Hall adequately and denied the motion. Courts are to grant substitution motions only when "counsel and defendant are so at odds as to prevent presentation of an adequate defense." *United States v. Walker,* 9 F.3d 1245, 1251 (7th Cir.1994). Where, as here, a motion to withdraw is denied, counsel are not free to ignore the court's finding because of their personal dislike for their client. While Hall was certainly not an ideal client, counsel were still required to provide constitutionally adequate representation until such time as the court excused them.

Even though the state courts had not found that Hall waived his right to effective assistance, the district court here believed that counsels' performance was a result of Hall's deliberate noncooperation. *Hall v. Washington,* 916 F.Supp. 1411, 1439 (C.D.Ill.1996). Looking only at the sentencing. phase, however, it is hard to see how Hall's behavior affected counsels' performance in any way when they never made even the first move to contact him. The examples of uncooperativeness cited by the district court all occurred before the trial began. We do not find waivers even of the right to counsel lightly. *United States v. Morrison,* 946 F.2d 484, 502 n. 4 (7th Cir. 1991) (referring to *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975)); *Love v. Young,* 781 F.2d 1307, 1316 (7th Cir.1986). Waiver of *competent* representation, to the extent this is possible, would have to be supported by equally clear evidence before it could excuse substandard performance. Given the state judge's own finding about Hall's cooperativeness after the initial outbursts and his decision to require counsel to continue in the case, we conclude that Hall's own conduct did not excuse counsels' neglect of the case.

Having determined that Ahlemeyer and Skelton's performance fell below the standard set by *Strickland* we must inquire also whether that deficiency resulted in prejudice to Hall, for substandard performance alone does not violate the Sixth Amendment right to effective assistance of counsel. Only where a reasonable probability exists that, but for counsel's substandard performance,

the sentencer "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death" will a violation of the Sixth Amendment be shown. *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068–69.

Counsels' failure to investigate and proffer available mitigation testimony, coupled with Ahlemeyer's choice of closing argument, meant that the trial court had a significantly different view of the balance between aggravating and mitigating circumstances when it made its initial decision. The trial court specifically stated that it had found a "complete absence of mitigating factors" and as a result, sentenced Hall to death. Without a reasonable showing of mitigation by the defense, the court had no choice: under the Illinois death penalty scheme, if no sufficient mitigating factors are found, "the court *shall* sentence the defendant to death." 720 ILCS 5/9–1(h) (emphasis added). See *Eddmonds,* 93 F.3d at 1320; *Williams v. Chrans,* 945 F.2d 926, 935 (7th Cir.1991).

As the summary above indicates, the overall picture of Hall looks quite different when his additional mitigating evidence is added to it. He wanted to present concrete instances of good behavior from his past, as well as testimonials from people who knew him in the prison. Investigation would have brought forward testimony that Hall, although he had taken the life of Frieda King, had also risked his own life to save at least one and perhaps two other women. Significantly, the incident in which he rescued Robinson from a robbery-in-progress occurred after his first time in prison. Hall even had a corrections department employee, Thomas O'Connor, who worked closely with him and who was willing to testify. We have noted that information from prison guards may be particularly helpful in deciding clemency petitions "as it is the guards who have daily contact with [the inmate] and therefore can realistically assess his person." *Shimer v. Washington,* 100 F.3d 506, 508 (7th Cir.1996). The trial court might have been impressed by the fact that a corrections employee was willing to speak up for the killer of another corrections employee.

In our view, there is a "reasonable probability" that the evidence Hall's lawyers never found might have resulted in a no-death finding by the court had it been presented at the proper time. We realize that the trial court, acting seven years later on the post-conviction petition, stated that Hall's additional evidence would not have changed his mind. This cannot, however, be conclusive; it must be subject to the "unreasonableness" review required by either 28 U.S.C. § 2254(d)(1) (if we characterize it as a mixed question of law and fact) or § 2254(d)(2) (if it is better viewed as a pure question of fact). In the absence of *some* review, trial courts would be able to disregard even the most powerful evidence with impunity. Either way, the reason why the judge believed the new evidence had no impact on his thinking is important. Both the trial judge and the Illinois Supreme Court thought that the newly proffered mitigation evidence was "mere" character evidence that was cumulative to evidence admitted at the sentencing hearing. *Hall II,* 193 Ill.Dec. at 104, 626 N.E.2d at 137. In its initial decision, however, the trial court had found that absolutely no mitigating factors— statutory or nonstatutory—were present. It made no mention of Hall's pleasant character, his willingness to perform good deeds (even at serious physical risk to himself), or his general demeanor around the prison. If *no* mitigating evidence was before the court during the initial hearing, it is logically impossible for the new evidence to be "cumulative" to something in the earlier record.

■ Furthermore, the trial judge's conclusion on post-conviction review was predicated on the assumption that the judge himself would have been the decisionmaker at sentencing if counsel had been competent. As our earlier discussion demonstrates, however, the record shows that Hall's waiver of a sentencing jury resulted from Ahlemeyer's and Skelton's failure properly to advise him about capital sentencing in the first place. To make matters worse, what they did tell him about jury determinations may well have misinformed him about the choice he faced when choosing between jury sentencing and bench sentencing.

Prior to the start of trial, Skelton told Hall that the difference between a jury trial and a bench trial was that "unanimity would be necessary and required in a jury setting," while if a judge were to try the case "it would be his decision alone." Neither attorney, either prior to trial or following Hall's conviction, told Hall that a different rule applies to a capital sentencing jury or explained Illinois' "one-juror" rule. Neither attorney spoke with Hall during the hour-long recess called by the court for the very purpose of allowing them to advise him about waiving a capital sentencing jury. When the court called an additional recess to allow them to provide this advice, Skelton spoke with Hall for only 40 seconds and told him only that he had the right to have a "jury determination" or "a judge's determination" at the penalty phase. Although Ahlemeyer was also present, he gave Hall no information at all about the waiver decision. As Illinois Supreme Court Justice Simon pointed out:

> the nature of the decision by a capital sentencing jury differs from that of an ordinary trial jury, with which the defendant had some previous experience, on the very point at issue here: the consequence of a single juror dissenting.... Far from providing any meaningful basis for the decision whether to waive the jury for sentencing, the defendant's prior experience with the jury system may actually have misled him on the consequences of unanimity. *Hall I*, 102 Ill.Dec. at 342, 499 N.E.2d at 1355 (Simon, J., dissenting).

Hall's attorney's explanation that "unanimity would be necessary and required in a jury setting" only made matters worse, insofar as it was unaccompanied by any suggestion that the system worked in exactly the opposite way at the sentencing stage.

Hall himself alerted the court to this problem *before* the sentencing hearing began (and thus before he learned whether the judge would be lenient or not), as soon as he learned how the system operated. The court, however, refused his request to revoke his waiver on the curious ground that it had discharged the earlier jury (which had never been used at the guilt phase). Because this indicates that the decisionmaker itself would have been different had counsel performed adequately, we conclude that the prejudice required by *Strickland* has also been shown here.

We accordingly hold that Hall received ineffective assistance of counsel at his capital sentencing hearing and that he must be granted a new sentencing hearing. This conclusion makes it unnecessary for us to consider his alternative arguments that focus exclusively on the sentencing proceeding. Hall also makes two arguments that affect his conviction: first, that he was deprived of an impartial adjudicator when the trial judge refused to recuse himself after Hall's assault, and second, that he was deprived of effective assistance of counsel at the trial when the judge forced his lawyers to continue representing him after they notified the court that the attorney/client relationship was "irretrievably lost." With respect to the need for the trial judge to recuse himself, we agree with the district court that there was no evidence of actual bias on the part of the judge, and thus no ground for relief on that theory under our decisions in *Del Vecchio v. Illinois Department of Corrections, supra,* and *Wilks v. Israel,* 627 F.2d 32 (7th Cir. 1980). With respect to the judge's refusal to permit counsel to withdraw from the case before the trial, for the reasons noted above we disagree that Hall's misbehavior would furnish an excuse for constitutionally ineffective performance. Nevertheless, our review of the trial record leads us to agree with both the district court and the Illinois Supreme Court in *Hall I* that counsels' performance before and during the trial was competent.

The judgment of the district court is therefore REVERSED in part and the case is REMANDED for the issuance of a writ of habeas corpus requiring a new sentencing hearing for petitioner Anthony Hall.