Wilder Kendric BERRY, Petitioner,

v.

Richard GRAMLEY, Warden of the
Hill Correctional Center,
Respondent.

No. 97 C 8623.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 16, 1999.

Kimball Richard Anderson, David E. Koropp, David James Doyle, John Edmund Mooney, Winston & Strawn, Chicago, IL, for Wilder Kendric Berry, petitioner.

Lisa Anne Hoffman, Illinois Attorney General's, Office, Chicago, IL, for Richard Gramley, Warden of Hill Correctional Center, respondent.

## MEMORANDUM OPINION AND ORDER

GETTLEMAN, District Judge.

In his petition for a writ of habeas corpus, Wilder Kendric Berry claims that his privately retained trial counsel, Leo I. Fox, was constitutionally ineffective in representing petitioner at his 1992 trial on the charges of aggravated kidnaping and aggravated criminal sexual assault. After briefing the issue, this court held an evidentiary hearing (the "habeas hearing")[1] at which petitioner, Fox and two other witnesses testified. Based on the record presented, this court is convinced that Fox's representation of petitioner was incompetent and ineffective under the standards established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and its progeny. Accordingly, the court grants the writ of habeas corpus.

### The Case[2]

At the time of the incident in question, October 31, 1991, petitioner, then age 22, who had never before been arrested or charged with a crime, was a probationary police officer with the University of Chicago police. At approximately 11:00 p.m. that evening, petitioner saw the alleged victim, 16 year old[3] Ms. Tolamey Gray ("Ms.Gray"), walking with some of her family members. Wishing to meet Ms. Gray, petitioner parked his car near the group and got out. Petitioner claims that he opened his trunk, retrieved a screwdriver and pretended to be working on the car. According to Ms. Gray and other witnesses, petitioner got a shotgun from the trunk of the car, approached the group with the gun, and told the group to leave while he kept Ms. Gray with him. Petitioner claims that he struck up a conversation with Ms. Gray near the open trunk, and that he took the shotgun out of the trunk and disassembled it to demonstrate that it was not a threat. Ms. Gray's family continued to their home, where they called the police. There is no dispute that petitioner did not use the shotgun again after replacing it in the trunk shortly after meeting Ms. Gray.

Petitioner claims that he and Ms. Gray took a walk in a nearby park for five or ten minutes, after which she got into his car and rode around with him for a period of time, during which he stopped at a gas station and made several telephone calls. No one else was in the car. Afterwards, according to petitioner, the couple went to petitioner's home, parking the car in the

1. Respondent initially contended that an evidentiary hearing was not warranted and actually precluded by 28 U.S.C. § 2254(e)(2). That section applies, however, "only when the applicant has failed to develop the factual basis of a claim in State court proceedings. Failure implies omission—a decision not to introduce evidence when there was an opportunity, or a decision not to seek an opportunity." *Burris v. Parke*, 116 F.3d 256, 258 (7th Cir.1997). In the instant case, petitioner attempted to develop the factual record, but was denied an evidentiary hearing on his post-conviction petition. As *Burris* makes

clear, a State cannot "insulate its decisions from collateral attack in federal court by refusing to grant evidentiary hearings in its own courts." *Id.* at 259.

2. The facts and the parties' conflicting versions recited herein are taken from the testimony presented at the underlying criminal trial and at the habeas hearing (including affidavits submitted by petitioner).

3. Petitioner testified at the criminal trial that Ms. Gray told him she was 18.

garage and walking to the front of the house. Petitioner testified that he stopped on the way into the house to talk with a friend, William Wheat. After entering the house, petitioner and Ms. Gray had consensual sex in petitioner's basement apartment.

According to Ms. Gray, after her family left, petitioner demanded sex, stating "either you give it to me or I'll take it from you with a gun to your head." Petitioner then forced Ms. Gray to enter the car, in which another man was seated in the back seat. Petitioner told her that if she cooperated she would not get hurt and would "get away alive." Ms. Gray admits that she did not try to escape or seek help, even when petitioner stopped at a gas station where people were present and where petitioner had a brief conversation with the other passenger before letting him off, or when they entered petitioner's home, where she heard petitioner speak to a woman.

Ms. Gray testified at trial that petitioner eventually drove to a garage, where he forced her to undress and have oral sex and vaginal intercourse in the car's back seat, lasting about five minutes. After that, he told Ms. Gray to spread her coat on the garage floor and forced her to have intercourse again, lasting about eight minutes. According to Ms. Gray, petitioner then led her by the arm, crying and naked except for a short coat, from the garage to the front of the house. She was carrying her other clothes. In the basement of the house he performed oral sex on her and had vaginal intercourse again. According

to Ms. Gray, when she resisted, petitioner threatened her repeatedly that he had a handgun, although she admits that she never saw such a weapon.[4]

Ms. Gray also admitted that after being repeatedly raped, in response to petitioner's demand she gave him her first name, the last name of her grandmother (with whom she lived), her phone number and her address. According to Ms. Gray, petitioner then drove her home, but forced her to perform oral sex and unsuccessfully attempted vaginal intercourse on the hood of his car a short distance from her home. Petitioner then gave Ms. Gray his first name ("Ken") and the telephone number of his pager.[5] When she returned home at 2:30 a.m., Ms. Gray told her family that she had been raped. In the days that followed, petitioner visited Ms. Gray's home several times and attempted to reach her by phone a number of times, leaving his name. There is conflicting evidence as to whether he identified himself as a policeman when he made some of these calls and visits. The police eventually traced a call to petitioner's home and arrested him on November 16, 1991. He has been in custody ever since.

Petitioner's family retained Leo Fox as a result of a reference from a family friend. Fox charged a flat fee of $3,500 to represent petitioner, which was paid over time by petitioner's sister. Fox claimed that he met with petitioner "10, 15 times," spending between five and fifteen minutes each time, to prepare the defense prior to trial, which took place March 3 and 4, 1992.[6] Fox admits that the only times he

4. A handgun was recovered from petitioner's home after his arrest. Petitioner claims that he obtained this weapon eleven days after the incident from his father for use at the police firing range.

5. A prosecution witness testified that the pager was no longer operational at the time petitioner gave the number to Ms. Gray. As discussed more fully below, petitioner disputes this claim and has evidence to disprove it.

6. Fox first made this claim in a sworn statement submitted in January 1993 to the Illinois

Attorney Registration and Disciplinary Commission ("ARDC"), with which petitioner had filed a complaint. Fox stated that the only thing he discussed with petitioner at those 10 to 15 meetings, as well as during the trial, was a statement petitioner had given at the time of his arrest, "because that [the statement] was the only thing we had." The ARDC dismissed petitioner's complaint based on Fox's statement. Fox has been the respondent in a number of proceedings at the ARDC, which suspended his license as the result of one such complaint. *In Re Leo I. Fox*, 122

met with petitioner to prepare for trial were in the "bullpen" (the lockup adjacent to the courtroom) before or after petitioner's court appearances on the criminal charges. Yet, when confronted with the docket entries from petitioner's case file, which established that the most he could have met with petitioner was twice, Fox conceded that the docket was correct and contradicted his earlier statement.

Moreover, it is uncontested that the bullpen is crowded with other prisoners, and petitioner testified at the habeas hearing that he was unwilling to discuss his case in the presence of other prisoners because he did not want to reveal to them that he was a police officer. Petitioner also testified that at each of the two brief visits with Fox in the bullpen, Fox promised to visit petitioner at the Cook County Jail, where they could spend as much time in private as they needed to prepare. Fox never kept that promise, and because petitioner had only Fox's beeper number [7] and could not receive calls at the jail, he was unable to call Fox directly. Petitioner's sister, Agnes Eloby, testified at the habeas hearing that she left numerous messages requesting Fox to visit petitioner, as well as to discuss other matters relating to the defense, to no avail.

It is clear to this court that Fox met with the petitioner no more than twice in the bullpen for several minutes each, and engaged in virtually no pretrial preparation. Had he taken the time and made the effort to prepare his case, Fox would have understood the nature of petitioner's defense theory—something his testimony at the habeas hearing demonstrated he still does not understand. For example, petitioner's and Ms. Gray's testimony conflicted sharply on petitioner's conduct when he drove Ms. Gray to his home. According to Ms. Gray, she was violently sexually assaulted three times after they pulled into the garage and before petitioner forced her, naked and crying, to go into the

house. Yet, her clothes were not seriously damaged and she had no marks, bruises, or other evidence of physical attack.

Most importantly, there was an eyewitness who saw and spoke to petitioner when he arrived home with Ms. Gray. William Wheat (a decorated veteran and currently a federal firefighter, whom this court found to be credible) testified at the habeas hearing that he saw petitioner pull into the garage with a young woman (whom Wheat did not know) in his car, and exit the garage after a minute to a minute and a half. Wheat saw petitioner walk to the front of the house followed by the young woman, who was dressed normally. According to Wheat, petitioner came to the curb outside his front porch to chat with Wheat for approximately four minutes, while the young lady leaned against the porch bannister. There was nothing unusual about petitioner's or young lady's demeanor.

Wheat's testimony thus contradicted Ms. Gray's in a number of material respects. According to Wheat: (1) the time the couple spent in the garage was not nearly enough to have permitted petitioner to repeatedly sexually assault Ms. Gray which, according to her, lasted at least 13 minutes; (2) Ms. Gray was not naked except for a short coat, as she had testified, nor was she carrying her clothes; (3) Ms. Gray was not lead by the arm or crying; to the contrary, Ms. Gray's demeanor and actions were normal, unlike someone who had just been kidnaped and repeatedly sexually assaulted; and (4) petitioner's conduct and demeanor were not that of someone in the midst of a violent abduction and sexual assault.

It is uncontested that Wheat called Fox and offered to testify for petitioner, explaining that he had seen petitioner with the alleged victim as the couple arrived at petitioner's house on the night in question. Yet, Fox never followed up or asked

---

Ill.2d 402, 119 Ill.Dec. 370, 522 N.E.2d 1229 (1988).

7. Apparently, Fox worked out of his home and had no office or secretary.

Wheat to give a statement, and never called Wheat as a witness (although he had put Wheat's name on his witness list). This is sadly consistent with Fox' nonchalant and unprofessional attitude about his representation of petitioner throughout the case.

There were several other witnesses whom Fox failed to call. Jay Pierre Canty filed an affidavit in the habeas proceedings, stating that he called petitioner at his home the night of the incident and held a 25 minute telephone conversation with him. Petitioner's mother (according to her affidavit) recalls receiving the telephone call from Canty while petitioner was in the basement with a woman, and further recalls petitioner coming upstairs to take the call. The testimony of these witnesses describes conduct by petitioner that is inconsistent with the notion that he was in the midst of committing an abduction and sexual assault when he received this call. It also shows that Ms. Gary was alone for a significant period of time in the basement which, according to petitioner, has a door that leads directly outside.

In addition, petitioner's father was available to corroborate petitioner's trial testimony that he did not possess a handgun until 11 days after the incident. Finally, there was evidence available to contradict a prosecution witness who testified that petitioner's pager number was not operational at the time he gave it to Ms. Gray. According to an invoice from the supplier of the pager and testimony of petitioner's sister, the pager was operational long after October 31, 1991. At the habeas hearing, Fox testified that he considered the pager to be irrelevant because petitioner was

located by tracing his telephone calls to Ms. Gray's home.[8] Once again, Fox's lack of preparation and incompetence led him to miss the point—that a rapist, (as opposed to a boyfriend) was unlikely to give his victim his operational pager number.

Despite knowing of this evidence, Fox called none of these witnesses and failed to produce any exculpatory or corroborative evidence. Fox testified at the habeas hearing that he was not interested in presenting any evidence other than petitioner's testimony, which he felt was more believable than Ms. Gray's.[9] As discussed more fully below, this purported decision by Fox resulted from his lack of preparation and understanding of the case, as well as his general blasé attitude toward the defense.

Petitioner raises two other points to demonstrate that Fox was ineffective. During jury selection, two prospective jurors provided information indicating that they would have difficulty being fair to petitioner. One, a sexual assault advocate, stated that she was a recent rape victim. Another stated that she had a close friend who had recently been raped, and that she "might tend to sway towards the victim's side." Yet, Fox failed to make a for-cause or peremptory challenge to any prospective juror. At the habeas hearing, Fox testified that his silence was driven by the desire not to be seen by the remaining jurors as being afraid to impanel these two potentially biased jurors.

Petitioner's remaining example of Fox's incompetence is the opening argument he made, which is repeated below in its entirety:

8. In his 1995 sworn statement to the ARDC, Fox stated (incorrectly) that the police had used the pager to locate petitioner.

9. Fox also testified that he had refused petitioner's request to hire an investigator (at petitioner's family's expense) to locate nonexistent "alibi witnesses." Petitioner denies making such a request. According to his sister and him, the only witnesses they wanted Fox to locate were people present on the

street when petitioner met Ms. Gray, whom they believed would support petitioner's version of the event. The court credits petitioner's testimony on this point, based on the court's disbelief of Fox's testimony (as discussed below) and the fact that petitioner never denied meeting Ms. Gray on the street or having sex with her. The notion of an alibi defense is nonsensical.

Your Honor, honored counsel for the State, ladies and gentlemen of the jury, after listening to the opening remarks by the State I almost feel obligated on behalf of Mr. Berry and myself to apologize to you. It is open and shut. Only trouble is that it always doesn't come in that way. You heard the Court say that the defense does not have to put on any defense of their own at this time. So, I don't think I am going to tell you much. I am going to ask you to listen. I think, maybe, at the end of the case you will give me back my apologies. Thank you.

Petitioner testified at the habeas hearing that after the verdict but before sentencing, he had prepared a written submission to the trial judge explaining the evidence he had wanted his attorney to present and complaining about Fox' conduct of the defense. When Fox learned of this proposed presentation, he directed petitioner not to show or mention it to the judge because it would anger the judge at sentencing.[10] Petitioner felt that he had no choice but to obey Fox's directive. When this court asked Fox about this incident, he admitted that petitioner's testimony on this point was correct, adding, "And, that, by the way, is the advice I give to practically everybody." [11]

Following his conviction, petitioner filed a direct appeal and a post-conviction petition, in the latter of which he claimed ineffective assistance of counsel. The trial court denied the post-conviction petition without an evidentiary hearing, relying heavily on Fox's sworn statement in the ARDC proceeding. The direct appeal was consolidated with the appeal of the denial of the post-conviction petition. The appellate court affirmed both decisions, again relying on Fox's sworn statement in rejecting petitioner's claim that Fox failed to prepare for trial. *People v. Berry,* (Slip Opin. (unpublished), at 27) (1st Dist.1995). The appellate court also held that petitioner had not shown prejudice by any of Fox's actions or inactions because, based on the evidence known to that court (including Fox's sworn statement, as well as affidavits from Wheat, Canty, and petitioner's parents), Fox's decision to not call these witnesses "was a matter of trial strategy" that was "virtually unchallengeable" under *Strickland.* (*Id.* at 26.) The court noted that, according to Fox's sworn statement, he believed that Wheat and petitioner's mother "would only confirm that the victim did not cry or scream out, a fact already before the jury through her testimony." *Id.* at 26. In addition, the court held that Fox's failure to challenge the prospective jurors was explained by "a matter of strategy". (*Id.* at 28.)

Petitioner filed a petition for leave to appeal to the Illinois Supreme Court, which was denied on October 4, 1995. Because petitioner has exhausted his state court remedies, this case is ripe for habeas review. *O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).

### The Legal Standard to Determine Effectiveness of Counsel

■ The Anti–Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d) ("AEDPA"), governs this court's

10. This supposed "tactic" was as unsuccessful as Fox' other maneuvers. Petitioner was sentenced to 35 years incarceration: 25 for aggravated criminal sexual assault and 10 for aggravated kidnaping, to be served consecutively.

11. Fox's directive to his client not to complain to the trial judge appears to have violated § 1.7(b) of the Illinois Rules of Professional Conduct, which prohibits a lawyer from representing a client whose interests conflict with the attorney's. *See* American Bar Association Committee on Ethics and Professional

Responsibility, Formal Opinion 94–384 (1994) (filing of complaint against lawyer concerning lawyer's own ongoing representation of client may present conflict under rule 1.7(b), as representation of client may be materially limited by lawyer's own interest in avoiding discipline). Especially in light of Fox's later false statement to the ARDC, Fox's advice to petitioner not to complain about his deficient representation must be viewed as the first step in Fox's attempt to cover up his ethical lapses.

consideration of petitioner's case. *Holman v. Gilmore*, 126 F.3d 876, 881 (7th Cir.1997). In *United States ex rel. Gaines v. Gilmore*, 1998 WL 427612 (N.D.Ill.1998), this court described the standard of review under the AEDPA:

Any claim adjudicated by a state court on the merits is governed by 28 U.S.C. § 2254(d), under which habeas relief may be awarded only where the state court's adjudication of a petitioner's claim: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States:" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). The first phrase of § 2254(d)(1)—authorizing habeas relief when the state court's decision is "contrary to" clearly established federal law as determined by the Supreme Court—pertains only to questions of law. *Lindh v. Murphy*, 96 F.3d 856, 868 (7th Cir.1996) (en banc), *rev'd on other grounds*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

The second phrase of § 2254(d)(1)—authorizing habeas relief when the state court's decision "involved an unreasonable application" of clearly established federal law as determined by the Supreme Court—pertains to mixed questions of law and fact. *Id.* at 870. This phrase "tells federal courts: Hands off, unless the judgment in place is based on an error grave enough to be called 'unreasonable.'" *Id.* A state court's application of Supreme Court precedent is reasonable if it is "at least minimally consistent with the facts and circumstances of the case." *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir.1997). "[W]hen the constitutional question is a matter of degree, rather than concrete entitlements, a ... responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support [a

state court's] judgment." *Lindh*, 96 F.3d at 871. Thus, "[t]he statutory 'unreasonableness' standard allows the state court's conclusion to stand if it is one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742, 748 (7th Cir.1997). In other words, if a state court asks the legally correct question [such as] whether the trial judge abused his discretion ... [then] the "fact-specific answer cannot be called 'unreasonable' even if it is wrong ..." *Lindh*, 96 F.3d at 867–77.

■ A claim of ineffective assistance is a mixed question of law and fact. *Strickland*, 466 U.S. at 698, 104 S.Ct. 2052, meaning this court's review of the state court decision is *de novo*. *Hall v. Washington*, 106 F.3d 742, 748 (7th Cir.1997). Under the AEDPA, however, "the court must answer the more subtle question of whether the state court 'unreasonably' applied clearly established federal law as the Supreme Court has determined it." *Id.* Although this court determined that petitioner was entitled to an evidentiary hearing, the court must accept as presumptively correct the state court's findings of fact made in the course of deciding the ineffectiveness claim, unless petitioner has rebutted that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Based on the evidence presented at the habeas hearing, the court concludes that plaintiff has so rebutted the state court's key factual finding—that Fox met with petitioner 10 to 15 times before trial to prepare the defense, and had thus developed an actual "trial strategy" for the case—by not only clear and convincing evidence, but by overwhelming and incontrovertible evidence.

The "clearly established federal law" that petitioner asserts the state court unreasonably applied is set forth in the Supreme Court's opinion in *Strickland*. To succeed in his claim of ineffective assistance of counsel, petitioner must demonstrate both that Fox's conducted fell below

an objective standard of reasonableness, and that a reasonable probability exists that, but for counsel's substandard performance, the decision reached would have been different. *Strickland,* 466 U.S. at 696, 104 S.Ct. 2052. With respect to the first element, petitioner must establish that Fox's conduct was "outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. 2052. With respect to the second element—prejudice—"a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case," but only that there is a "reasonable probability that the result would have been different." A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 694, 104 S.Ct. 2052. Petitioner must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. 2052.

### Discussion

As indicated above, petitioner's attorney spent virtually no time preparing a defense of the criminal charges, resulting in a trial in which the jury was asked to take petitioner's word alone against the alleged victim's. Fox failed to visit the crime scene or employ an investigator to locate corroborating witnesses. Although the identity and testimony of a number of exculpatory witnesses who corroborated petitioner's testimony were known to Fox, and although petitioner and his family tried to get Fox to call them,[12] he refused to do so. Fox's proclaimed "strategic" reasons for not presenting this evidence is unbelievable. Based on his testimony and demeanor, as well as the materially false

12. Petitioner testified that his first opportunity to communicate with Fox about preparation for the trial was on the first day of trial, and that he did so in open court by writing notes on a legal pad—notes that were ignored by Fox. Fox also ignored numerous entreaties by petitioner's family to meet with petitioner at the Cook County Jail and to call the witnesses discussed above. Moreover, petitioner

statement he submitted to the ARDC, this court finds that he is not credible.

The Court therefore finds that the following facts have been established by petitioner by clear and convincing evidence:

1. Other than reviewing a statement petitioner made to police shortly after his arrest, Fox totally failed to prepare a defense for petitioner's criminal trial, despite repeated entreaties by petitioner, his family, and witnesses;

2. As a result, Fox did not understand the nature of the defense and remained willfully ignorant of material exculpatory and corroborative evidence available for the trial;

3. Specifically, Fox ignored and failed to present the following testimony and evidence that directly contradicted the prosecution's evidence against petitioner:

(a) William Wheat's testimony that corroborates petitioner's testimony that he and Ms. Gray went directly from the garage to petitioner's house, and directly contradicts Ms. Gray's testimony that she was repeatedly assaulted in the garage over a period of at least thirteen minutes and then forced, naked and crying, into the house by petitioner;

(b) the testimony of Canty and petitioner's mother that corroborate petitioner's testimony that Ms. Gray consensually entered and stayed in petitioner's basement apartment;

(c) The testimony of petitioner's father that he gave petitioner the handgun found in petitioner's room eleven days after the incident; and

(d) Evidence that the pager was operational at the time petitioner gave Ms. Gray his pager number.[13]

never reviewed his testimony with Fox or otherwise prepared for direct or cross examination.

13. Although Fox's failure to challenge two prospective jurors and his brief opening statement are highly questionable, the court does not find that these deficiencies alone would justify granting the writ. However, they are

It is important to note several things about this evidence. First, neither the trial judge nor the jury that convicted petitioner knew about any of this evidence at the trial. In fact, it is quite possible that the jury (as well as the trial judge) disbelieved petitioner's testimony that he met Wheat and spoke to Canty and his mother, when petitioner failed to present these witnesses at the trial to corroborate his testimony.

Second, at the post-conviction stage, the trial judge and the appellate court (not to mention the ARDC) credited Fox's sworn statement that he had met petitioner ten to fifteen times before trial, each meeting lasting between five and fifteen minutes, to prepare a strategy. In fact, Fox met with petitioner only twice for a few minutes, had no substantive conversations with petitioner, and had no strategy other than to cross examine the prosecution witnesses and present petitioner as a witness, without any preparation for that testimony. Fox's sworn statement to the contrary was a self-serving lie,[14] as was just about everything he has said and done in connection with this case. Fox knew that this lie was relied on by the post-conviction courts and the ARDC, resulting in petitioner's continued incarceration. This court is convinced that Fox would have continued to lie about his pretrial preparation had not petitioner's habeas counsel ferreted out the facts that disproved what he had sworn to.

Third, this court does not mean to imply that it has decided issues of guilt, innocence or the credibility of trial witnesses in reviewing the trial record and conducting the habeas hearing. Those are matters left to the state court should the state's attorney decide to retry petitioner. The point is that any such trial must meet minimal constitutional standards of fairness, including effective representation by competent counsel.

Fourth, this court is not granting the writ of habeas corpus only because of its low regard for Mr. Fox. Rather, the factors that led the court to that unhappy conclusion compel the granting of the writ. In addition to the objective evidence of his ineffectiveness discussed above—evidence that is largely uncontroverted—the court is inclined to disbelieve Fox's testimony at the habeas hearing and to draw opposite inferences in many instances. For example, Fox's feigned refusal to search for alibi witnesses (see fn 9 above) was merely a cover for his disinterest in doing or arranging any investigation into the facts of the case. Likewise, Fox's explanation that petitioner's post-arrest statement was "all we had" is a lame excuse for his failure—if not outright refusal—to meet with petitioner to prepare for trial.

Fox's lack of credibility is bolstered by his incorrect view of the facts (e.g., his mistaken belief that petitioner was located through his pager), as well as his demeanor on the stand. To be sure, any attorney accused of incompetence would feel somewhat uncomfortable testifying about his or her performance. Fox's demeanor, however, went beyond discomfort. His displayed the classic signs of disingenuousness and hostility to the entire process. His memory was conveniently vague and clear, depending on when it suited his purposes. In short, it is clear to this court, that, beginning with petitioner's complaints during and after the trial and lasting through his testimony at the habeas hearing, Fox has been more concerned with protecting his reputation and practice than in being truthful.

Finally, the state courts cannot be faulted for ruling as they did, based on what they knew. Both the trial and appellate court saw fit to credit the sworn statement

considered for their cumulative effect in determining Fox's ineffectiveness, as more fully discussed below.

14. Fox cannot blame faulty memory for the falsity of his sworn statement, since it was made only ten months after the trial.

of an officer of the court when examining petitioner's post-conviction pleadings. As the appellate court concluded, taking Fox at his word, the deficiencies identified by petitioner were matters of trial strategy developed after Fox conferred with petitioner between 10 and 15 times for 15 minutes each, and as such were not grounds for claiming ineffective assistance of counsel. *People v. Berry,* (Slip Opin. 25–28.) Now we know that Fox cannot be taken at his word, especially with respect to the very statement relied on by the state courts. The conclusive discrediting of that statement destroys the premise on which those courts relied.

The court therefore concludes that Fox's performance as petitioner's trial counsel was constitutionally defective under the *Strickland* standard because that performance was entirely deficient, fell below the objective standard of reasonableness, and prejudiced petitioner. The deficiencies of Fox's representation is discussed in detail above. The prejudice to defendant is obvious: the jury that convicted him never considered material evidence that supported petitioner's version of the facts and directly contradicted the prosecution's evidence.

Thus, applying *Strickland,* the court finds that there is a "reasonable probability" that, (a) the result of the criminal trial would have been different, and (b) confidence in the outcome of those proceedings has been undermined. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. This conclusion is apparent when the deficiencies of trial counsel are considered cumulatively, as is appropriate in the instant case. *See Williams v. Washington,* 59 F.3d 673, 682 (7th Cir.1995). As mentioned above (at fn. 13), while Fox's failure to strike apparently biased potential jurors and his perfunctory opening statement would not, by themselves, constitute ineffective assistance of counsel, when added to the many other acts of incompetence and unprofessional conduct they lead to the inescapable conclusion that "counsel's errors were so serious as to deprive [petitioner] of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

Although the state post-conviction courts concluded that Fox's actions of which those courts were aware could be attributed to the execution of a trial strategy—a conclusion that this court ordinarily would not disturb under the standards of 28 U.S.C. § 2254(b) discussed above—that conclusion was based on Fox's sworn statement erroneously credited by those courts. In *White v. Godinez,* 143 F.3d 1049, 1055 (7th Cir.1998), vacated on other grounds (— U.S. —, 119 S.Ct. 2335, 144 L.Ed.2d 233), *original opinion reaffirmed* 192 F.3d 607 (7th Cir.1999), the Seventh Circuit considered a similar issue of lack of preparation for trial. In *White,* the court held that counsel's failure to consult with his client or otherwise prepare for trial, leading to a failure by counsel "to comprehend the evidence in the case," results in prejudice under *Strickland* and its progeny. If such evidence of lack of preparation is established, "then the further missteps [petitioner] alleges are almost necessarily not attributed to sound strategy decisions." As in *White,* petitioner has made the required showing that "there is at least a reasonable probability that the jury would have seen matters differently" had the defense presented the corroborating and exculpatory evidence discussed above. *Id.* at 1056.

### CONCLUSION

For the foregoing reasons, the court grants petitioner's writ of habeas corpus and direct that petitioner be released from custody unless the State of Illinois retries petitioner within 90 days of this decision.