1. Petitioner also names James E. Doyle, Attorney General of Wisconsin, as a respondent. According to Rule 2 of the Rules Governing

*Conclusion*

For the reasons discussed, we *GRANT* Ford's motion to dismiss Risk's claims of discrimination and retaliation based upon the 1994 awards of overtime and her January/February 1995 reclassification and transfer, as those claims are barred by the appropriate statute of limitations. Also, we *GRANT* Ford's motion to dismiss Risk's claims of harassment, discrimination and retaliation based upon the conduct alleged in paragraphs 18 and 25 of the amended complaint, as those claims are beyond the scope of her EEOC charge. However, we *DENY* Ford's motion to dismiss Risk's claim of discrimination and/or retaliation based upon the conduct alleged in paragraph 21 of the amended complaint.[11]

It is so ORDERED.

**Vonaire T. WASHINGTON, Petitioner,**

v.

**Judy SMITH, Warden, Oshkosh Correctional Institution, Respondent.[1]**

No. 97–C–0424.

United States District Court, E.D. Wisconsin.

April 29, 1999.

Section 2254 Cases, the state attorney general is an appropriate respondent only if the applicant is not presently in custody pursuant to the state judgment against which he seeks relief, but may be in the future. Since this is apparently not the case with petitioner, the

proper respondent is simply the Wisconsin

officer with present custody of Washington.

Robert R. Henak of Shellow, Shellow & Glynn, S.C., Milwaukee, WI, for plaintiff.

William C. Wolford, Ass't Atty Gen., Madison, WI, for defendant.

### DECISION AND ORDER

ADELMAN, District Judge.

This is a habeas corpus action brought by petitioner Vonaire T. Washington pursuant to 28 U.S.C. § 2254. Petitioner is in custody pursuant to a state court conviction. The basis for his habeas petition is that his trial counsel's performance constituted ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

### I. PROCEDURAL BACKGROUND

On July 20, 1990, petitioner was charged in Milwaukee County Circuit Court with two counts of armed robbery as party to a crime in violation of Wis.Stat. §§ 934.32(1)(a) & (2) and 939.05, and one count of possession of a firearm by a felon in violation of Wis.Stat. § 941.29(2). These charges arose out of his alleged participation, along with two other people, in the armed robbery of a Milwaukee tavern on July 15, 1990. James L. Johnson was also charged in the complaint.

On June 13, 1991, following a four day trial, the jury rejected petitioner's defense of alibi and mistaken identity and found him guilty of the charges. Prior to sentencing Washington retained new counsel. On September 17, 1991, Judge Victor Manian sentenced petitioner to consecutive sentences totaling 22 years in prison.

Petitioner then filed a motion for post-conviction relief in state court claiming that at the trial he was denied the effective assistance of counsel. Judge Manian held a hearing on the motion and then denied it. Petitioner appealed, and the Wisconsin Court of Appeals affirmed the conviction in an unpublished decision.[2]

### II. STATEMENT OF FACTS

#### A. Robbery, Witness Identification of James L. Johnson and Johnson's Defense[3]

At about 4:15 p.m. on July 15, 1990, three men robbed the Jolly Skot tavern on West Lisbon Avenue in Milwaukee. One of the men was armed with a shotgun; another had a handgun. The tavern owner, who was tending bar at the time, fell to the floor. The man brandishing the shotgun jumped onto the bar. The bartender heard the man with the shotgun ask "Should I pop him?" and a reply from one of the other robbers, "Yes, pop him." However, no shots were fired. The man wielding the shotgun took the bartender's wallet and loose currency. The robbers also took money from the tavern cash register and robbed three other persons in the tavern at the time.

Two days after the robbery police stopped a car driven by Johnson and found a gun stuffed in the crease of the front seat. The officers searched Johnson and found a loaded clip for the gun, and a driver's license and identification card for Jane Marie Dornuff. Three days later the tavern owner attended a four-man lineup. Although he could not visually identify any of the subjects as the robbers, he recognized Johnson's voice as that of the man who had discussed "popping" him with the

---

**2.** *See State v. Washington,* 182 Wis.2d 511, 514 N.W.2d 879 (Wis.App.1994).

**3.** Some of the following facts are taken from the decision of the Wisconsin Court of Appeals in the appeal of James L. Johnson. *See State v. Johnson,* 181 Wis.2d 470, 510 N.W.2d 811 (Ct.App.1993).

man holding the shotgun. Jane Marie Dornuff, who was in the Jolly Skot tavern during the robbery, identified Johnson as one of the robbers from a photograph of the lineup. She testified that Johnson was the man with the handgun, and that he had placed the gun to her head and taken her wallet and bracelet.

Johnson did not testify at the trial but called two friends as alibi witnesses. One of these witnesses, Carla J. Bellamy, admitted that she was Johnson's girlfriend and the mother of his daughter. She specifically denied knowing where the Jolly Skot tavern was and denied going to the tavern either on July 15 or at any other time. Yet, both the Jolly Skot's owner/bartender and James Earl Davis testified that Bellamy walked into the tavern approximately ten to twenty minutes before the robbery, appeared to use the pay telephone, and then left after about five minutes. They both told the jury that they did not hear Bellamy drop any coins into the pay telephone.

## B. Witness Identification of Vonaire Washington and Washington's Defense

About 6:00 p.m. on the day of the robbery the police stopped a Mazda in the 1600 block of North 29th Street. In the Mazda were three men, one of whom was petitioner Vonaire Washington. A police officer testified that Washington was seated in the front seat, although Washington testified he was in the rear. The other occupants of the vehicle were Clifford Beasley and Leother Lobley. A gym bag containing two shotguns and shotgun shells was recovered from the front passenger seat.

The police brought the three men to the Jolly Skot to see if the victims of the robbery could identify them. The bar owner, whose name happened to be James D. Johnson, could not identify any of them as a participant in the robbery. Jane Marie Dornuff and James Earl Davis testified at the trial that they identified Washington

as one of the robbers. Dornuff testified that Washington was the man with the shotgun, although on cross-examination she agreed with codefendant Johnson's lawyer that she may have earlier told police it was Johnson who had the shotgun. Davis testified that Washington had a black gun with a big barrel. None of the patrons of the bar identified the men whom police brought back to the bar with Washington as being participants in the robbery.

Washington was not in the lineup the police conducted on July 18. Although the tavern owner identified Johnson's voice at the trial, he pointed toward Washington as being the person whose voice he recognized. He also said that the voice he identified was not that of the man with the shotgun but of the second man. Davis also viewed the lineup; he said that the fourth person in the lineup looked familiar but that he wasn't positive.

Defendant Vonaire Washington testified on his own behalf and called two alibi witnesses. Washington testified that on the day of the robbery he was staying with Sandra Blue at 2538 North 45th Street. At about noon that day, he borrowed Blue's car and went to the home of Gola Richardson at 1852 North 24th Place near 24th Place and Vine. He arrived about 1:00 p.m. When he arrived, he conversed and watched television with Gola Richardson and her siblings Sharon and David Brown. They watched the circus parade, found it boring and switched to a movie, "The Great Escape," which lasted about three hours. After the movie ended, Washington and David Brown talked on the porch. It rained. Jerome Pickens came over and joined Washington and Brown.

After the rain stopped, Washington and Brown heard men arguing down the street, and they walked to the sidewalk to see what was happening. One of the men arguing pulled out a gun and started shooting at a house. The shooter then jumped on a motorcycle and, as he rode

off, a second gunman went into the street and fired at the first.

As Washington, Pickens and Brown discussed what they had witnessed, Washington's beeper went off. Sandra Blue was beeping him. Because there was no phone in the house, Washington walked to a nearby tavern and telephoned Blue, advising her that her car would not start and telling her about the shooting. This was at 3:30 or 4:00 p.m, according to Washington.

Petitioner then returned to the house where he stayed until about 5:45 p.m., when two persons he knew pulled up in a car. These individuals were Clifford Beasley and Leother Lobley. They were going to the wake of Edward Lobley, whom Washington also knew. Washington testified that he got in the back seat. Washington wanted to go to the wake also.

Shortly after Washington got in the car police stopped the vehicle. Washington testified that he did not know about the shotguns in the bag in the front seat. He testified that he never met his codefendant James L. Johnson until after the robbery when both were in jail. Washington also admitted that he had seven prior criminal convictions.

Sandra Blue testified that Vonaire Washington resided with her. She said that on the day of the robbery Washington woke up at 11:30 or 12:00 noon, and she loaned him her car. At about 4:00 p.m. she beeped him because she wanted him to bring her car back. Washington telephoned her and told her he was on 24th and Vine and that the car would not start. As far as Blue was aware, defendant Vonaire Washington did not know James L. Johnson. Blue also admitted having two criminal convictions.

Jerome Pickens testified that he was with Washington continuously at Gola Richardson's house from about 2:30 p.m. until about 6:00 p.m., except when Washington left for a few minutes to make a phone call. He testified that he saw a shooting take place on 24th Street about 3:30 p.m. He also stated that he never saw Washington with codefendant James L. Johnson. Pickens said that he had two previous criminal convictions.

### C. Trial Counsel's Representation

On June 11, 1991, the second day of trial but before the jury was sworn,[4] Washington addressed the court regarding concerns about his representation. He asserted that his attorney, Isadore Engle, never came to him to discuss strategy, what witnesses were to be used or why he was to use them. He said that he asked Engle to subpoena numerous witnesses but that Engle had not done so. Engle at first denied this allegation saying, "He never asked for one [witness]." (Ex. P at 8.) However, at the postconviction hearing Engle acknowledged that Washington had given him the name of Gola Richardson months before the trial and a list of additional witnesses immediately before the trial began.[5]

Subsequent to trial, a postconviction hearing on ineffective assistance of counsel was held. Engle testified at the postconviction hearing on ineffective assistance that he was appointed to represent Washington on February 5, 1991, after Washington's first lawyer was disbarred. Engle testified that he had been practicing law as a sole practitioner since 1944 and that 95% of his practice was criminal law. Engle testified that he did not normally use an investigator and he did not retain an investigator or other assistants in connection with Washington's defense.

---

4. The dates of the trial transcripts of June 10 and 11, 1991 (Exs. P and Q), are transposed. Exhibit Q addresses in limine motions and jury selection while Exhibit P contains opening arguments and evidence.

5. Washington testified at the postconviction hearing that he advised Engle within two weeks of Engle's having been appointed as his lawyer that on the day of the robbery he was at 1852 North 24th Place with Gola Richardson, David Brown, Sharon Brown and Jerome Pickens.

### 1. Gola Richardson

On April 22, 1991, almost two months before the trial date, Engle filed a notice of alibi listing Gola Richardson as an alibi witness. Richardson was the only witness he listed on the notice. At the postconviction hearing Engle was asked if he had interviewed Gola Richardson. Initially he answered that he had, stating "that's right." (Ex. V at 6.) He then amended his answer and testified that his efforts to interview Richardson were unsuccessful:

Q. And did you—you attempted to interview her or did you actually interview her prior to trial?

A. Attempted on about three occasions.

Q. And were these attempts in person or by telephone?

A. Both. But she had no telephone.

Q. She had no telephone, but yet you did attempt to contact her somehow by telephone? How was that?

A. That's when I found out that she had no telephone.

Q. Did you succeed in speaking to Ms. Richardson at all before trial?

A. Never.

(Ex. V at 7.)

Later in the hearing Engle testified that he visited Richardson's house on three occasions:

A. Robert Jones identified himself as a live-in boyfriend; said that Gola Richardson was not home, that he would advise her to contact me which he failed to do even though I left a calling card . . . I remember he answered on one occasion. I don't remember what happened on the other occasions.

(Ex. W at 19–20.)

Engle did not subpoena Gola Richardson in advance of trial. On June 11, 1991, the second day of a four-day trial, Engle asked the sheriff to serve her with a subpoena for June 13. When asked why he waited until the second day of trial to subpoena her, Engle testified: "I had no way of knowing what day I would need [her]."

(Ex. W at 37.) The sheriff was unable to serve the subpoena and told Engle that Richardson was gone for a week. Thus, Gola Richardson did not testify at the trial.

She did testify at the postconviction hearing, however. She testified that Washington came to her house on the day in question, and that she watched television with him and witnessed a shooting down the street. She said that Washington came in the afternoon and was with her continuously from his arrival until his departure about 6:00 p.m. or later. She also testified that her sister and brother, Sharon and David Brown, and Jerome Pickens were present and that Washington left on foot because his car would not start.

### 2. David and Sharon Brown

Washington testified at trial that at the time of the robbery he was at Gola Richardson's house with Richardson, David and Sharon Brown and Jerome Pickens. One of the matters explored at the postconviction hearing was why the Browns did not testify. Washington testified that he told Engle about the Browns soon after Engle became his lawyer. Engle presented different versions of when he first learned about the Browns. First, he testified that Washington gave him the Browns' names and asked that he interview them just before the trial began.

Q. . . . didn't Mr. Washington request that you interview them?

A. I believe he did on the day of trial. That was the first time.

Q. Is that statement you just made based on your recollection or on some notes that you have?

A. No, I have notes.

. . . . .

(Ex. V at 8.)

Engle then testified that he misfiled his notes:

Q. May I see your notes?

A. I have several sheets of notes which I can't seem to locate. I may have

misfiled them into another file, but I did make notes.

(Ex. V at 10.)

Washington's lawyer at the postconviction hearing subpoenaed Engle's notes, but Engle never produced any notes and continued to testify that he might have misfiled them.

Later in the hearing Engle testified that he first learned of the Browns not on the first day of trial but on the last day, during Washington's direct examination:

Q. So now hearing the testimony in response to your questions he names Sharon and David?

A. This was brand new material.

Q. So this is your testimony that this is the first time you ever heard those names from Mr. Washington.

A. Exactly.

Q. And you didn't know these names at all prior to his taking the stand and telling you in front of the jury?

A. That is correct.

Q. When you heard those names, were you surprised?

A. Yes.

(Ex. W at 13.)

However, Engle then testified that Washington gave him a list of witnesses including the Browns "just before we started the trial." (Ex. W at 15.) He said that he never discussed with Washington any of the witnesses on the list or their testimony, and he made no attempt to interview or to subpoena the Browns. Rather, Engle advised Washington to produce the witnesses on the list himself, although Washington was in custody:

Q. Did you ever ask him if any of those potential witnesses had phone numbers that Mr. Washington could provide to you?

A. I asked him to provide them at trial if he could do so and he did produce two of them. Namely, he produced

Sandra Bloe [sic] and he produced Jerome Pickin [sic], and I used both of them.

Q. In other words, you left it to your client to try to get those witnesses to court?

A. There was no way I could have an opportunity to contact them at that late time. I was busy trying the case.

Q. Now, Mr. Washington was in custody at the time of the trial; is that right?

A. That's right.[6]

(Ex. W at 17.)

David Brown also testified at the postconviction hearing. He testified that on July 15, 1990, he was living with his sisters Gola Richardson and Sharon Brown and that Washington came to their house early in the afternoon. He testified that Washington remained at the house until 4:00 to 5:00 p.m. and that Gola Richardson, Sharon Brown and Jerome Pickens were also present. He recalled that it rained that day, and a shooting occurred down the street. Sharon Brown did not testify at the postconviction hearing because she was in the Milwaukee County House of Correction.

### 3. Police Reports and Leother Lobley

Engle testified that he obtained copies of the police reports regarding Washington's arrest months before the trial. One police report included a statement made by Leother Lobley, one of the individuals in the vehicle in which Washington was a passenger prior to being arrested. Lobley told the police that the shotguns found in the car and introduced as evidence against Washington were not Washington's. He also verified Washington's testimony that they picked him up about 6:00 p.m. at 24th and Vine.

---

**6.** Washington managed to contact Sandra Blue and Jerome Pickens on his own by calling them from jail, and they appeared at trial. The Browns did not have a telephone.

Engle testified that he could not read the police officer's handwriting and, therefore, he never read the police report. Thus, Engle did not interview Lobley and did not know about Lobley's statement.[7] The postconviction testimony on this point was as follows:

Q. Leotha Lobly [sic] was one of the three men in the car that was arrested along with Mr. Washington in the hours after the robbery; is that correct, Mr. Engle?

A. I don't know if he was or not.

Q. Well, directing your attention specifically to page 36 [of the police report]; is that writing with the last word on line 6, can you read that out loud?

A. No. I have trouble reading this entire matter. There is only a few words here that I can make out. I can't read it.

Q. So then would I be correct that you went into this trial not knowing what this witness, Leotha Lobly [sic], had told the police with regard to this incident because you couldn't make out the handwriting of the Detective Hudlet [sic]?

A. I couldn't make out all of it. No.

. . . . .

(Ex. V at 22–23.)

Q. Now, I'd like you to go down three lines from there, and the middle of the line, there is a sentence that starts with the word "on."

A. "On the way to North 24th of West Brown they picked up Vonaire Washington at North 24th and West Vine. States that he—

Q. Okay. That's far enough. Now, that location North 24th and West Vine, in your preparation for this case, did you find any significance to that location?

A. I believe that was near the place where he was supposed to have been staying.

Q. The place where he was located, essentially his alibi?

A. Right.

Q. So during your preparation for this case, assuming that the statement does say that Shorty G. gave this to them, a large blue gym bag, you never had that information in your head when you prepared this case; is that right?

A. That's right.

Q. And the guns that were found here were ultimately introduced as evidence against Mr. Washington.

A. That's right.

(Ex. W at 6–7.)

### D. Circuit Court Decision on Postconviction Motion

The circuit court made no specific findings of fact but concluded that Engle's representation "under all the circumstances was not inefficient [sic] and that his performance did not fall below the standard of a reasonably competent attorney in this community, or an average attorney in this community...." (Ex. W at 94.) The court also concluded that, because Washington was able to present some alibi evidence, he was not prejudiced.

The court appears to have found that Engle unsuccessfully attempted to interview Gola Richardson on three occasions and that, on the second day of trial, he unsuccessfully attempted to subpoena her. The court found that this "unfortunately is not an unusual way of proceeding in these criminal cases." *Id.* The court also appears to have credited Engle's claim that Washington gave him the Browns' names just before trial. The court made no factual findings regarding Lobley.

---

7. Another police report contains a statement from the other person in the car, Clifford Beasley, that the duffel bag with the shotguns came from Washington. Engle was unaware of this report also. The prosecution did not call Beasley as a witness at trial.

### E. Court of Appeals Decision

The court of appeals affirmed. Regarding Richardson, the court concluded that Engle's efforts to have her appear for trial were reasonable under prevailing professional norms. Regarding the Browns, the court upheld the circuit court's implicit finding that Engle learned about them immediately before trial. The court found that Engle's failure to request an adjournment was not prejudicial and that the Browns' testimony would have been cumulative. Regarding Leother Lobley, the court found that Engle's performance was deficient but not prejudicial.

### III. STANDARD OF REVIEW

The Sixth Amendment provides that "[in] all criminal prosecutions, the accused shall ... have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court has emphasized the essential nature of this right:

> That a person who happens to be a lawyer is present at trial alongside the accused ... is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results.

*Strickland v. Washington*, 466 U.S. 668, 685, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive, for it affects his ability to assert any other rights he may have." *Kimmelman v. Morrison*, 477 U.S. 365, 377, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (quoting Walter Schaefer, *Federalism & State Criminal Procedure*, 70 Harv.L.Rev. 1,8 (1956)). Moreover, the right to counsel is the right to effective assistance of counsel. *Evitts v. Lucey*, 469 U.S. 387, 395–96, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985).

In order to prevail on his claim of ineffective assistance of counsel Washington must prove two elements. First, he must demonstrate that Engle's representation of him fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. In determining whether counsel's performance was objectively reasonable, the court must consider the performance from the perspective of counsel at the time of the alleged error. *Kimmelman*, 477 U.S. at 384, 106 S.Ct. 2574 (citing *Strickland* at 689, 104 S.Ct. 2052). Additionally, there is a presumption that counsel's performance falls within the wide range of reasonable professional assistance. *Strickland* at 689, 104 S.Ct. 2052. Washington must rebut this presumption by proving that Engle's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. *Kimmelman* at 384, 106 S.Ct. 2574 (citing *Strickland* at 688–89, 104 S.Ct. 2052). In analyzing the issue of reasonableness, the court "should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Strickland* at 690, 104 S.Ct. 2052.

Second, Washington must demonstrate that counsel's deficient performance prejudiced the defense. Prejudice is shown when "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. 2052. "The result of a proceeding can be rendered unreliable and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* at 694, 104 S.Ct. 2052. The question on review is "whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "Reasonable probability" under this standard is defined as "probability sufficient to undermine confidence in the outcome." *Id.* In addressing this issue the court should consider the totality of the evidence. *Id.* at 695, 104 S.Ct. 2052.

■ Both the performance prong and the prejudice prong of *Strickland* have traditionally been reviewed de novo. *Jones v. Page,* 76 F.3d 831, 840 n. 8 (7th Cir.1996). Effective April 24, 1996, however, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214, amended the federal habeas statute.[8] As amended by AEDPA, 28 U.S.C. § 2254(d)(1) now provides that a petition for a writ of habeas corpus shall not be granted unless the challenged state court conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." This provision still entitles federal courts acting within their jurisdiction to interpret the law independently, but requires them to refrain from "fine tuning" state court interpretations. *Lindh v. Murphy,* 96 F.3d 856, 870, 877 (7th Cir. 1996) (en banc), *rev'd on other grounds,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). In *Hall v. Washington,* 106 F.3d 742 (7th Cir.1997), the Seventh Circuit described the new standard in this way:

> [O]ur review of state courts' legal determinations continues to be de novo. So, too, does our review of mixed questions of law and fact. Under the AEDPA, however, we must answer the more subtle question of whether the state court "unreasonably" applied clearly established federal law as the Supreme Court has determined it.

*Hall* at 748 (internal citations omitted). The *Hall* court went on to explain the meaning of the reasonableness standard:

> The statutory "unreasonableness" standard allows the state court's conclusion to stand if it is one of several equally plausible outcomes. On the other hand, Congress would not have used the word "unreasonable" if it really meant that federal courts were to defer in all cases to the state court's decision. Some decisions will be at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary, that a writ must issue.

*Id.* at 748–49. The Seventh Circuit has also stated that to be unreasonable a state court ruling must be more than simply "erroneous" and perhaps more than "clearly erroneous." *Hennon v. Cooper,* 109 F.3d 330, 334 (7th Cir.1997).

Based on the foregoing principles, the question raised by Washington's petition for habeas relief is whether the state courts' application of *Strickland* to the facts of this case was unreasonable.[9] Washington's petition alleges ineffective assistance of counsel in three separate respects: (1) Engle's failure to subpoena Gola Richardson until the second day of a four-day trial; (2) Engle's failure to investigate or subpoena David Brown and Sharon Brown; and (3) Engle's failure to read the police report and follow up on Lobley's statement.

## IV. DISCUSSION

### A. Was Counsel's Performance Deficient?

#### 1. Failure to Subpoena Richardson Before Second Day of Trial

■ Engle knew well before the June 10 trial that Richardson was an alibi wit-

---

**8.** As Washington's petition was filed after the enactment of AEDPA, the new habeas corpus standard of review applies.

**9.** In addition to arguing that the state court ruling was an "unreasonable application" of *Strickland,* petitioner also argues that the state court decision was "contrary ... to clearly established Federal law" because it used the wrong standard under *Strickland,* i.e., that petitioner had to prove that but for his ineffective representation he would have

been acquitted. It is true that requiring petitioner to prove he would have been acquitted but for ineffective representation is an incorrect legal standard under *Strickland.* I cannot say, however, that the Wisconsin Court of Appeals applied this standard in their decision. The court held that it was not reasonably probable that Washington would have been acquitted, which is the correct standard under *Strickland.*

ness. He listed her on the notice of alibi that he filed with the court on April 22. He also believed she was Washington's only alibi witness and knew that Richardson might not be easy to contact.[10] Nevertheless, Engle waited until the second day of trial to attempt to subpoena Richardson. The sheriff's department was thus unable to serve the subpoena because Richardson was gone for the week.

Most cases on the proper timing of subpoenas arise when a party requests a continuance based on the nonappearance of a witness, or a new trial based on newly discovered evidence.[11] Courts generally deny these requests unless the litigant can show "due diligence" in attempting to subpoena the witness. *United States v. Oliver,* 683 F.2d 224, 228 (7th Cir.1982) (failure to subpoena a witness or request a continuance undermines claim of due diligence); *United States v. Shaw,* 920 F.2d 1225, 1230 (5th Cir.1991) (failure to subpoena important defense witness when available constitutes lack of due diligence); *United States v. Quinn,* 901 F.2d 522, 528 (6th Cir.1990) (government's issuance of a subpoena on Thursday before Monday trial, despite one month notice of trial date, held unreasonable); *Triplett v. State,* 666 So.2d 1356, 1361 (Miss.1995) (failure to subpoena important defense witness when available constitutes lack of due diligence).

In this context, "due diligence" has been defined as follows:

It must affirmatively appear that [counsel] exercised due diligence in procuring process for witnesses to appear at trial and delay showing lack of diligence may preclude his securing a continuance because of their absence. If,

however, the delay is due to the negligence of the sheriff or other officer, accused will not be affected thereby.

Due diligence requires that [counsel] should have subpoenas issued in ample time to procure service, or to take depositions if attendance cannot be had, and delay for varying periods after indictment has been held, under the circumstances of the particular case to show lack of diligence.

. . . . .

It has been held that diligence is not shown where [counsel] waits to secure issuance of process for absent witnesses until the day the case is called for trial, or until the trial has actually begun, or until an unreasonably short time before the trial is scheduled to begin . . .

*Elam v. State,* 50 Wis.2d 383, 390, 184 N.W.2d 176 (1971) (quoting 22A C.J.S. *Criminal Law* § 503b(2) (1971)).

The due diligence standard is a judicially created test to determine the adequacy of an effort to procure the appearance of a witness at trial. The question of whether it was reasonable for Engle to wait until mid-trial to subpoena Gola Richardson is similar if not identical to the issue presented in due diligence cases. Thus the due diligence concept and its application by courts is instructive in analyzing the reasonableness of Engle's performance. It is therefore significant that, of the above cases applying the due diligence standard, none would have found that waiting until the second day of a four-day trial to subpoena an important alibi witness constitutes due diligence. In view of Engle's failure to exercise due diligence, it would

---

**10.** Regarding Engle's attempts to interview Richardson, the trial court remarked:
> I don't know. I'm not sure what else Mr. Engle could have done. Perhaps he could have hired an investigator and have him go out there, but he went out there three times himself. Being an old kind of lawyer, I suppose he wanted to do it himself and tried to find the witnesses for the alibi. (Ex. W at 94.) The trial court ultimately found that Engle's efforts to contact Richardson did

not constitute deficient performance, and the court of appeals agreed. I am bound only by the factual finding that Engle made three attempts to contact Richardson.

**11.** In the latter situation the opponent of the request typically argues that the evidence would have been available if counsel had exercised due diligence in issuing a subpoena.

surely be incongruous to say he nevertheless rendered reasonable professional assistance as required by *Strickland*.

Additionally, several circuits have addressed the issue of whether the untimely issuance of a subpoena constitutes ineffective assistance of counsel. In *Huffington v. Nuth*, 140 F.3d 572, 579 (4th Cir.1998), the petitioner argued that his counsel's failure to subpoena a key witness before the first day of trial was ineffective assistance. The court held that this conduct was not ineffective assistance, but only because counsel's decision regarding the timing of the subpoena was a tactical decision. Counsel's strategy was to keep the identity of defense witnesses from the state "until it's too late for the State to scare them away." *Id.* The court accepted this as a strategic choice but in doing so clearly assumed that, had the late subpoena not been strategic, the delay would have constituted deficient performance. Similarly, in *Rivera v. Collins*, 934 F.2d 658 (5th Cir.1991), the court held that failure to mail subpoenas in advance of trial to two physician witnesses was not ineffective assistance, but only because one doctor was on vacation and would not have received the subpoena and the other was ill and could not have testified. *Id.* at 660. Again, the court appeared to assume that the untimely issuance of subpoenas would constitute ineffective assistance if it actually resulted in the nonappearance of otherwise available witnesses.

In the present case, Engle's failure to subpoena Richardson until the second day of trial was not the result of a strategic decision. Engle had known for months that Richardson was a critical witness, and presumably he intended to call her at trial. He also knew from experience that she might be difficult to reach. There was no strategic reason not to subpoena her well in advance of trial; in fact, there was every reason to do precisely that.

Engle testified that he did not subpoena Richardson earlier because he did not know what day he would need her. This is not a compelling excuse. Uncertainty about exactly when a witness will be required is characteristic of all trials. Moreover, Engle could have solved this problem without risking the possibility of not being able to serve Richardson. He could have subpoenaed her in advance of trial, required her to appear on the second or third day and attached a note advising her to phone him to discuss details.

The trial court seemed to excuse Engle's conduct because of crowded court calendars:

> ... the subpoena that he (defense counsel) sent out to Sharon Richardson [sic]—Was that the second day of trial?—unfortunately is not an unusual way of proceeding in these criminal cases. They often get adjourned so often that in order not to frustrate the witnesses, the attorneys don't subpoena them until they're actually going to be able to testify and that they really are needed, so they don't end up coming down here two or three times, sometimes often only to be told to go home and they would be notified of the next trial date.
>
> That's a sad commentary on some of the crowded calendars that the courts are working under, but it happens more often than we like where we have several cases scheduled and ultimately one of those goes on and some of the others have to be adjourned.... So I don't find that particularly unusual.

(Ex. W at 92–93.)

The trial court's rationalization is unpersuasive. That some lawyers might wait until trial to subpoena critical witnesses, as did Engle, does not make the practice reasonable. The phrase "sad commentary"—used to describe crowded court calendars—might equally have been applied to Engle's handling of the subpoena. Engle's procrastination prevented the subpoena from being served, thereby causing his client to undergo trial without his key witness. I disagree with the state courts and conclude that Engle's failure to subpoena

Richardson until the middle of trial *was* deficient performance. Under the circumstances, Engle's actions did not constitute reasonable professional assistance and did not fall within prevailing professional norms. Therefore, the state decisions finding Engle's conduct regarding Richardson to be reasonable were unreasonable applications of the *Strickland* standard.

### 2. Failure to Investigate and/or Subpoena the Browns

Engle presented two versions of when he learned that the Browns were potential alibi witnesses. He initially testified that the Browns' names were on a list Washington gave him just before trial; later he testified that he did not learn about the Browns until the fourth day of trial when Washington himself testified. In response to questions after relating the first version of events, Engle testified that he never asked Washington about the Browns or their testimony when he viewed Washington's list. He told Washington to produce the witnesses himself because he was too busy trying the case. Washington, however, was in custody during trial and could not reach the Browns because they had no phone. Although Washington's postconviction testimony was that he told Engle about the Browns soon after Engle was appointed counsel, the trial judge implicitly credited Engle's testimony that he got the Browns' names immediately before trial. The court of appeals held that this finding was not clearly erroneous, and I am therefore bound by it.

 Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Strickland,* 466 U.S. at 691. As a general rule, an attorney must investigate a case in order to provide minimally competent professional representation. *Crisp v. Duckworth,* 743 F.2d 580, 583 (7th Cir.1984). Investigation may help an attorney "develop or even discover a defense, locate witnesses, or unveil impeachment evidence." *Id.* Failure to in-

vestigate can be enough in some instances to constitute ineffective assistance of counsel. *White v. Godinez,* 143 F.3d 1049, 1054 (7th Cir.1998). An attorney must look into readily available sources of evidence. *Hall,* 106 F.3d at 752–53. A strategic decision by counsel not to call a particular witness is entitled to deference, but no deference is required if counsel failed to attempt to investigate. *Bryant v. Scott,* 28 F.3d 1411, 1417 (5th Cir.1994). *See also Montgomery v. Petersen,* 846 F.2d 407, 412 (7th Cir.1988) (nonstrategic decision not to investigate is inadequate performance); *United States ex rel. Cosey v. Wolff,* 727 F.2d 656, 658 n. 3 (7th Cir.1984) (defense counsel's out of hand rejection of potential witnesses and decision not to call those witness because he perceived prosecution's case as weak falls below minimum standard of professional competence); *Workman v. Tate,* 957 F.2d 1339, 1345 (6th Cir.1992) (where counsel fails to investigate and interview promising witnesses and thus has no reason to believe they would not be valuable, counsel's inaction constitutes negligence).

 In the present case, even after he learned about the Browns Engle failed to discuss their potential testimony with Washington or find out how they could be reached. Thus, he did not discover that the Browns supported Washington's alibi. Engle did not try to contact or subpoena the Browns, although he had lined up virtually no witnesses to testify for his client. Engle was not excused from his duty to investigate by the fact that he became aware of the Browns immediately before trial. *Grooms v. Solem,* 923 F.2d 88, 90 (8th Cir.1991). "Once a defendant identifies potential alibi witnesses, it is unreasonable not to make some effort to contact them to ascertain whether their testimony would aid the defense." *Id.* Further, Engle had sufficient time during the trial to confer with Washington about calling the Browns as witnesses and to attempt to interview and/or subpoena them. The trial lasted four days, and the Browns lived

with Gola Richardson within a few miles of the courthouse.

Engle testified that the reason for his inaction was that he "was busy trying the case." (Ex. W at 17.) This is not a reasonable excuse for wholly ignoring possible exculpatory witnesses, even if discovered on the eve of trial. A lawyer cannot afford to ignore potentially important evidence merely because it comes to light just before trial. An attorney's obligation to investigate does not end when the voir dire begins. Further, Engle's midtrial subpoena of Richardson undercuts his claim that he was too busy to discuss or try to contact new witnesses. He could easily have subpoenaed the Browns when he subpoenaed Richardson. He could have interviewed them outside the courtroom and then decided if they would help his client's case. Engle, in fact, used this method with the two witnesses, Blue and Pickens, whom Washington managed to produce from his jail cell.

Engle's failure to confer with his client about the Browns or to attempt to contact or subpoena them was unreasonable under prevailing professional norms.[12] His refusal was not based on strategy and therefore is entitled to no deference. To do nothing, as Engle did, falls below the standard of objective reasonableness set forth in *Strickland*. Engle's performance with respect to the Browns was therefore deficient.

### 3. Failure to Investigate Information in Police Report

█ Engle testified that he obtained copies of the police reports months before trial. One report included a statement made to police by Leother Lobley. Lobley was one of the occupants of the car in which Washington was riding when he was arrested about two hours after the robbery. Lobley told police that Washington had no connection to the gym bag containing two shotguns and shotgun shells, which was found in Lobley's car and introduced as evidence against Washington at trial. Lobley told Detective Hudlett that an acquaintance of his known as "Shorty G." gave him and Clifford Beasley the gym bag before Washington got in the car. Lobley also stated that the men picked Washington up at 24th and Vine. Engle, however, was unaware of Lobley's statement because he could not read Hudlett's handwriting and because he made no effort to contact Hudlett or anyone else to help him read the report. Thus, he did not investigate or subpoena Lobley.

As discussed in connection with the Browns, failure to investigate is reasonable only if counsel made a "rational decision that investigation is unnecessary." *Crisp*, 743 F.2d at 583. The court of appeals concluded that Engle's failure with respect to the police report and Lobley was deficient performance. Respondent does not dispute this conclusion. (Resp't Br. at 11.) I agree. *See also Williams v. Washington*, 59 F.3d 673, 680 (7th Cir.1995) (attorney breached duty to investigate by failing to familiarize himself with letter written by complainant, detailing allegations against defendant.)

### B. Was Counsel's Deficient Performance Prejudicial?

█ In order to prevail on his petition, Washington must also show that he was prejudiced by Engle's deficient performance. He must show that "counsel's er-

---

12. Washington clearly raised the issue of trial counsel's failure with respect to the Browns before the state courts. (*See* ex. B at 29–30.) The circuit court did not address the issue, and the court of appeals addressed only a part of it—Engle's failure to request an adjournment of trial to procure the Browns' testimony—which the court held was not prejudicial. Because the state courts never directly addressed Engle's failure to investigate or subpoena the Browns, there is no state court decision to assess for reasonableness. However, even if the state courts had explicitly found Engle's failures in this regard to be reasonable, that decision would have been an unreasonable application of clearly established federal law, as determined by the Supreme Court in *Strickland*.

rors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland* at 687, 104 S.Ct. 2052. There must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. In weighing counsel's errors, I may "consider their cumulative effect in light of the totality of the circumstances." *Crisp,* 743 F.2d at 583. Even if individual acts or omissions are not so grievous as to merit a finding of prejudice, "their cumulative effect may be substantial enough to meet the *Strickland* test." *Id.* at 583.

▮▮▮ The trial court held that Washington did not show prejudice because the defendant's "alibi was presented to the jury." (Ex. W at 94.) The court of appeals agreed. Specifically, the appellate court concluded that the Browns' testimony would have been cumulative to that of Blue and Pickens. With respect to Lobley, the court reasoned that two tavern patrons had identified Washington and that Lobley's testimony about picking up the defendant near Richardson's home was cumulative and would not have made Washington's participation in the robbery less likely in light of the witness identifications. The court also concluded that Lobley's statement about the shotguns could have been contradicted by Beasley's potential statement.

I disagree with the conclusion of the state courts and hold that the cumulative effect of Engle's errors deprived Washington of a fair trial. Engle's performance "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland* at 686, 104 S.Ct. 2052. I believe that if Engle had rendered reasonable professional assistance there is a reasonable probability that the decision of the jury would have been different. *Strickland* at 696, 104 S.Ct. 2052.

But for Engle's errors, Washington would have presented an overwhelmingly stronger case. Four witnesses would have supported Washington's testimony that he was at or near Gola Richardson's home when the robbery occurred. These witnesses, Gola Richardson, David and Sharon Brown and Jerome Pickens, would have consistently verified that Washington was with them continuously on the afternoon of the robbery, from early in the afternoon until around 6:00 p.m., except for a few minutes when he left to make a phone call.

In addition, Leother Lobley would have corroborated picking up Washington at about 5:45 p.m. near 24th and Vine, very close to Richardson's home.[13] Lobley also would have testified that the shotguns found in the car were not Washington's. Obviously, such testimony would have been important because the shotguns were the only physical evidence purporting to connect Washington to the robbery. Washington was stopped by the police less than two hours after the robbery took place, but the police found no evidence connecting him to the victims.[14] The prosecution stressed the importance of the guns, arguing in closing:

> As I indicated to the jury during the trial, I find it curious that a person going to their brother's wake would have

---

**13.** Neither Sharon Brown nor Lobley testified at the postconviction hearing. However, in ruling that "the testimony of the Browns would have been cumulative" (Ex. E at 8) and that Lobley's testimony "was cumulative" and "could have been contradicted by the other occupant Clifford Beasely [sic]" (Ex. E at 6), the court of appeals implicitly found that Brown would have testified as did her brother and that Lobley would have testified consistent with his statement to police. *See Schneller v. St. Mary's Hosp. Med. Ctr.,* 162 Wis.2d

296, 311–12, 470 N.W.2d 873 (1991) (trial court's finding of fact may be implicit from its ruling). I defer to these findings. *Lieberman v. Washington,* 128 F.3d 1085, 1091 (7th Cir. 1997).

**14.** In contrast, Washington's codefendant James L. Johnson was arrested two days after the robbery still in possession of the property of one of the victims.

two shotguns in the car as Mr. Washington indicates they did. The State's position has always been that Mr. Washington was, in fact, the individual who had shotguns on that day.

(Ex. U at 8.) [15] In short, the guns corroborated the state's eyewitnesses and helped impeach Washington's exculpatory testimony. Moreover, based on a question asked by jurors during deliberations, it appears the jury focused on the guns. The question was: "Why was car containing Vonair [sic] and guns stopped by police?" (*See* Attach. to Pet'r's Reply Br.)

The defense presented by Washington was much weaker than the one available to him. Three of the four witnesses who were with him when the robbery occurred, according to Washington, did not testify. To dismiss the significance of these witnesses as did the court of appeals, by calling them "cumulative" to the testimony of Pickens and Blue, is unreasonable. First, Blue's testimony was of marginal value because she did not testify to being with Washington at the time of the robbery. More importantly, the court of appeals confused corroborating evidence with cumulative evidence. Corroborating evidence adds strength. To "corroborate" means:

> To strengthen; to add weight or credibility to a thing by additional and confirming facts or evidence. The testimony of a witness is said to be corroborated when it is shown to correspond with the representation of some other witnesses, or to comport with some facts otherwise known or established.

*Black's Law Dictionary* 344 (6th ed.1990). Cumulative evidence is a very limited type of corroborating evidence, i.e., "[t]hat which goes to prove what has already been established by other evidence." *Id.* at 380. To say something is cumulative thus has the connotation of "heaped on" evidence offered to prove something already established beyond reasonable dispute.

Washington's whereabouts at the time of the robbery were not established beyond dispute at trial; indeed that was the very issue in dispute. The testimony of Richardson, the Browns and also Lobley would have added significant weight and credibility to Washington's alibi defense. Their testimony would not have been merely cumulative. See *Crisp*, 743 F.2d at 585 (finding that "having independent witness corroborate a defendant's story may be essential" and "testimony of additional witnesses cannot automatically be categorized as cumulative and unnecessary"); *Moffett v. Kolb*, 930 F.2d 1156, 1162 (7th Cir.1991) (affirming grant of habeas relief and finding that additional evidence, although consistent with evidence already in record, may have been crucial to defense).

Additionally, the testimony of Richardson and the Browns cannot be regarded as cumulative in that, while Blue and Pickens had criminal records, there is no evidence that the same is true of Richardson and the Browns. Thus, they may not have been subject to impeachment on this ground. See *Montgomery*, 846 F.2d at 411, 415 (counsel ineffective for not calling additional disinterested alibi witnesses not subject to same impeachment as family members). Rather than one direct alibi witness with a criminal record (Pickens), Washington would have had the benefit of three potentially more credible corroborating witnesses, all of whom claim to have spent the afternoon of the robbery with Washington.

Further, an effective defense of Washington would not only be a matter of producing more alibi witnesses, but of assuring the jury that all Washington's potential alibi witnesses actually supported his alibi. Given the absence of Richardson and the Browns, the jury surely was left to wonder why the people whom Washington said he was with did not testify at trial. The

---

**15.** While the closing arguments were not reported, the prosecutor later acknowledged that she made this argument to the jury. (Ex. U at 8.)

testimony of Richardson and the Browns was necessary to prevent jurors from drawing a negative inference from their nonpresence and to enable the jury to evaluate the relative credibility of both the prosecution and defense cases. *See, e.g., State v. Sarinske,* 91 Wis.2d 14, 53–54, 280 N.W.2d 725 (1979) (discussing theory of "missing witness" instruction); *Harris v. Reed,* 894 F.2d 871, 879 (7th Cir.1990) (holding that counsel's failure to produce witnesses referred to in opening statement was prejudicial); *Anderson v. Butler,* 858 F.2d 16, 19 (1st Cir.1988) (holding that failure to produce expert witnesses to support defense theory mentioned in opening was prejudicial).

In the present case no record was made of opening statements, so we do not know what exactly Engle alluded to. However, during voir dire Engle told the jury that he would call Richardson as a witness. Further, Washington himself testified that he was with Richardson and the Browns when the robbery occurred. Thus, the jury had reason to draw an inference adverse to Washington based on the nonappearance of Richardson and the Browns.

It is of course difficult, after a trial in which a defendant was ineffectively represented by counsel, to determine whether the outcome of the case would have been different had the defendant's lawyer been competent.[16] It is possible that the jury would have nonetheless rejected Washington's alibi defense. With respect to Lobley's statement in particular, a second police report contained Beasley's statement that the bag containing the guns did belong to Washington. Again, it is possible that the jury would have regarded Beasley as more credible than Lobley. However, the state did not call Beasley as a witness at trial, and Beasley had an obvious interest in disassociating himself from the guns. In any event, it is likely that had Lobley

corroborated Washington's testimony about the guns and about picking him up near Richardson's home, the jury would have given greater weight to Washington's denial of involvement in the crime. A jury may find evidence sufficient to create a reasonable doubt as to guilt, even if it finds such evidence to be marginally less credible than that presented by the state. *See State v. McCallum,* 208 Wis.2d 463, 475, 561 N.W.2d 707 (1997). Reasonable doubt is the criminal defendant's holy grail. Washington is not required to prove his innocence or that he would certainly have been acquitted, but only that there is a "reasonable probability" that had counsel been effective the trial would have produced a different outcome, i.e., the jury would have been unable to find guilt beyond a reasonable doubt. *Strickland* at 693, 104 S.Ct. 2052; *Sullivan v. Fairman,* 819 F.2d 1382, 1393 (7th Cir.1987).

The state's case against Washington was not overwhelming. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland* at 696, 104 S.Ct. 2052. Tavern owner James D. Johnson could not identify Washington. Bar patron James Earl Davis purported to identify Washington. However, Davis also recalled that only two rather than three possible suspects were presented for identification soon after the crime and that Washington was presented wearing handcuffs—an assertion police stated was untrue. Davis later failed to identify codefendant James L. Johnson at a lineup. Davis' credibility, therefore, was not irrefutable. Bar patron Jane Marie Dornuff also purported to identify Washington as the man carrying the shotgun. However, at codefendant Johnson's preliminary hearing, she testified that she was unsure if Johnson was the one with the handgun or the shotgun. She also acknowledged

---

16. *See generally* Donald A. Dripps, *Ineffective Assistance of Counsel: The Case for an Ex Ante Parity Standard,* 88 J.Crim.L. & Criminology 242, 278–85 (1997); Martin C. Calhoun, *How to Thread the Needle: Toward a Checklist Based Standard for Evaluating Ineffective Assistance of Counsel Claims,* 77 Geo. L.J. 413, 433 (1988).

that she may have told Detective Hudlett that Johnson was the one with the shotgun. Davis and Dornuff both had a relatively brief opportunity to view the perpetrators of the robbery. As has been noted, "[t]he vagaries of eyewitness identification are well known; the annals of criminal law are rife with instances of mistaken identification." *United States v. Wade,* 388 U.S. 218, 228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). In sum, the state's case was not unassailable, and many of these arguments were aired at trial. Had Washington been effectively represented in other respects, it is reasonably probable that the balance of evidence would have shifted in his favor and established reasonable doubt.

*Strickland* requires that the defendant receive a fair trial, meaning one whose result is reliable. In this instance, Engle's performance prevented crucial evidence from being presented. The jury was thus unable to weigh the strengths and weaknesses of the victims' identifications against the strengths and weaknesses of the testimony of Richardson, Sharon Brown, David Brown and Lobley. Under these circumstances it is impossible to conclude that Washington got a fair trial or to have confidence in the result of that trial.[17] Counsel's inadequate performance "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland* at 686, 104 S.Ct. 2052.

## V. CONCLUSION

As amended by AEDPA, the habeas statutes provide that an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted, unless the state judgment resulted in a decision contrary to or involving an unreasonable application of clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d). For the reasons stated above, I find that the decisions of the state courts in Washington's case involved an unreasonable application of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Petitioner's application for a writ of habeas corpus will therefore be granted. In order to afford the state the opportunity to retry petitioner, I will stay the execution of this order for 120 days.

**THUS, IT IS HEREBY ORDERED** that Vonaire T. Washington's petition for a writ of habeas corpus is *GRANTED,* pursuant to 28 U.S.C. § 2254. *IT IS FURTHER ORDERED* that execution of this order is stayed for 120 days.

---

17. My determination that counsel's performance was deficient and that this deficiency was prejudicial is based on the three areas of deficient performance discussed. However, it is worth noting that the transcripts of the trial and the postconviction hearing reveal other examples of statements and conduct by Engle that undermine confidence both in his performance and in the fairness of the proceedings. Counsel, for example, repeatedly stated that he made notes of his meetings with Washington about the case. Yet he was unable to produce these notes when they were subpoenaed. He then said that he might have mistakenly put the notes in the wrong file. Counsel also presented conflicting statements both about whether he interviewed Richardson and as to when Washington first notified him

that the Browns were potential defense witnesses. At one point he denied that Washington had ever asked him to interview any witnesses. Additionally, Engle's handling of Washington's direct examination suggested a serious lack of preparation. Counsel had little control and allowed the testimony to ramble, prompting numerous objections by the prosecutor and intervention by the court. Engle's lack of preparation was also demonstrated in his examination of Blue and Pickens, the two witnesses who appeared, not through his own efforts, but because Washington contacted them from jail. Engle was clearly unfamiliar with them and their testimony, and his direct examination of them was perfunctory.